UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS and TEAMSTERS UPS NATIONAL NEGOTIATING COMMITTEE,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED PARCEL SERVICE, INC.,**<br><br>Defendant. | C.A. No.: |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, the International Brotherhood of Teamsters and the Teamsters UPS National Negotiating Committee (together the "Union"), by and through counsel, hereby states the following cause of action against the Defendant, United Parcel Service, Inc. ("UPS" or "Company"). The Union also simultaneously moves for preliminary injunctive relief against UPS under Rule 65 of the Federal Rules of Civil Procedure.

Plaintiffs bring this action in their capacity as parties to a collective bargaining agreement with UPS, as well as in their representative capacity on behalf of all individuals represented by the Union and its Local Unions and employed by UPS who are, or will be, deprived of certain contractual rights under the parties' collective-bargaining agreement. This action seeks to enjoin UPS from offering bargaining unit employees its incentive-based voluntary separation Driver Choice Program ("DCP"), and repudiating the collective bargaining agreement, pending the conclusion of the parties' contractual grievance arbitration procedures.

In support thereof, the Union states as follows:

**Parties**

1. Plaintiff International Brotherhood of Teamsters (the "IBT") is a labor organization within the meaning of the National Labor Relations Act ("the Act"), 29 U.S.C. § 152(5), and has its principal place of business in Washington, DC.

2. Plaintiff Teamsters UPS National Negotiating Committee ("TUPSNNC") is a committee made up of officers, employees, and members of the IBT that negotiates and enforces the collective bargaining agreements between UPS and the IBT.

3. Defendant UPS is a corporation duly organized under the laws of the State of Delaware and is authorized to do business in the Commonwealth of Massachusetts. UPS, which has its principal place of business in Atlanta, Georgia, is engaged in the business of shipping and receiving and supply chain management. UPS is engaged in an industry affecting commerce as defined in Section 2(6) and (7) of the Act, 29 U.S.C. § 152(6) and (7). UPS can be served via is registered agent Corporation Service Company, 84 State St., Boston, MA 02109.

**Jurisdiction**

4. This action arises under the Labor Management Relations Act ("LMRA"), 29 U.S.C.§§ 141 *et. seq*. Jurisdiction over suits for violation of a contract between an employer and a labor organization is conferred on this Court by Section 301 of the LMRA, 29 U.S.C.§ 185; jurisdiction also is vested in this Court pursuant to 28 U.S.C.§§ 1331 and 1337.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as the actions giving rise to this dispute occurred within the jurisdiction of the United States District Court for the District of Massachusetts. Jurisdiction and venue are proper in this Court.

**Factual Background**

**The Parties' Collective Bargaining Agreement**

6. At all times relevant to this action, the Union and UPS have been, and continue to be, parties to a collective bargaining agreement - the "National Master United Parcel Service Agreement" ("NMA") - covering the terms and conditions of employment of feeder drivers, package drivers, sorters, loaders, unloaders, porters, office clerical, clerks, customer counter clerks, mechanics, maintenance personnel (building maintenance), car washers, and certain other employees of UPS. A copy of the current NMA, effective from August 1, 2023 through July 31, 2028 (the "NMA"), is attached as **Exhibit 1**.

7. The NMA contains provisions setting forth wage rates, benefits, vacations, holidays, and other negotiated terms and conditions. The NMA also includes in Article 8 a grievance and arbitration procedure that establishes a process for addressing all grievances relating to the violation or infraction of the NMA. The grievance procedure culminates in an arbitration hearing before a neutral, third-party arbitrator selected from an American Arbitration Association national panel list and all aspects of the arbitration procedure shall be governed by the Rules of the American Arbitration Association. Under Article 8, arbitration decisions are "final and binding" on the Union and UPS.

8. The bargaining unit description contained in the "Employees Covered" clause of Article 1 of the NMA includes "feeder drivers, package drivers, sorters, loaders, unloaders, porters, office clerical, clerks, customer counter clerks, mechanics, maintenance personnel (building maintenance), car washers, United Parcel Service employees in the Employer's air operation, and to the extent allowed by law, employees in the export and import operations performing load and unload duties, and other employees of the Employer for whom a signatory Local Union is or may

become the bargaining representative. Employees of CSI and UPS Latin America, Inc. are also covered by this Agreement as specified in the P&D Supplement and the Challenge Air Cargo Supplement, respectively." The bargaining unit description does not limit the scope of the bargaining unit to a particular address, city, or location. Indeed, Article 3, Section 1 of the NMA provides that the UPS employees covered by the NMA "constitute one (1) bargaining unit."

9. Article 6, Section 1 of the NMA provides, in part, that "Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void."

10. Article 1 of the NMA provides, in part, that UPS and the Union "enter into this Agreement with a mutual intent of preserving and protecting work and job opportunities for the employees covered by this Agreement."

11. Article 3, Section 1 of the NMA provides, in part, that "[t]he Employer recognizes and acknowledges that the National Union Committee and Local Unions affiliated with the International Brotherhood of Teamsters are the exclusive representatives of all employees of the Employer in covered classifications."

12. Article 3, Section 7(a) of the NMA provides, in part, that UPS "shall make every reasonable effort to maintain a sufficient workforce to staff its operations with bargaining unit employees."

13. Article 4 of the NMA is titled "Stewards." It provides, in part, that, "When requested by the Union or the employee, there shall be a steward present whenever [UPS] meets

with an employee *concerning* grievances or discipline or investigatory interviews. In such cases, the meeting shall not be continued until the steward or alternate steward is present." (Emphasis added).

14. Article 22, Section 3 of the NMA provides, in part, that UPS has "the obligation to create at least seventy-five hundred (7500) new full-time jobs from existing parttime jobs during the last three years of [the NMA] throughout its operations covered by [the NMA]; one thousand (1000) in the third year of the contract; three thousand (3000) in the fourth year; and thirty-five hundred (3500) in the fifth year of this Agreement." Section 3 goes on to provide that, "The number of full-time jobs created under Article 22, Section 3 of the 1997-2002, the 2002-2008, the 2013-2018 and the 2018-2023 Agreements shall not be reduced."

15. In Article 26, Section 2 of the NMA, UPS and the Union established a "Joint UPS/IBT Competition Committee", the purpose of which is "discussing and evaluating proposals which, if adopted by the Committee, could create additional bargaining unit jobs, enable [UPS] to more effectively compete with other companies, implement new services and products, or change existing services."

16. In addition to the NMA, employees of UPS are covered by local supplemental agreements or riders based on the geographic location of their workplace (e.g., New England, Central Region, Western Region, and Southern Region). The supplemental agreements and riders contain the negotiated procedures governing bargaining unit employee layoffs and/or reductions-in-force. A copy of the New England Supplemental Agreement that covers UPS bargaining unit employees working in Massachusetts is attached as **Exhibit 2**.

17. Article 57, Section 3 of the New England Supplemental Agreement sets forth the procedures to be followed when UPS decides to lay off bargaining unit employees. Article 57,

Section 3 contains a detailed "bumping" process that must be followed in the event of "an extended layoff" of bargaining unit employees, whereby more senior are permitted to "bump" (i.e., displace) less senior employees from their positions if they are subject to a layoff. The other NMA Supplemental Agreements contain similar layoff machinery. UPS has exercised its rights under this language many times, laying off thousands of bargaining unit employees since the most recent iteration of the NMA took effect on August 1, 2023.

### UPS Driver Choice Program

18. On or about January 9, 2026, UPS, through its President, Global Labor Relations and Deputy General Counsel, Labor, Daniel P. Bordoni ("Bordoni") informed IBT General President Sean O'Brien ("O'Brien") that UPS intended to offer bargaining unit employees the opportunity to participate in the DCP, whereby eligible employees would receive a lump sum payment in exchange for, *inter alia*, resigning their employment, waiving all legal claims against UPS, and agreeing not to seek employment with UPS at any time in the future. UPS informed the Union that it intended to mail the DCP materials to employees beginning on February 11, 2026, and that the window period for employees to elect to participate in the DCP would be from February 13 to March 12, 2026. Bordoni provided O'Brien with several documents related to the DCP, including a draft "Offer Letter." The Offer Letter states, in part, that, "In a world where the rate of change is accelerating, we're making thoughtful, forward-looking decisions to position UPS for lasting success. As part of these changes, **we are continuing to reshape our network and will be adjusting staffing across the U.S. to match our business needs**." (Emphasis in original). A copy of the draft Offer Letter is attached as **Exhibit 3**.

19. UPS developed and created the DCP without notice to, and bargaining with, the Union. The Union was informed of the existence of the DCP after all material terms of the DCP

were finalized by UPS, and the DCP was presented to the Union as a *fait accompli*.

20. In order to participate in the DCP, UPS employees must execute a "DCP Separation Agreement and Release" (the "Release"). A copy of the Release provided to the Union is attached **Exhibit 4**.

21. The Release contains a provision titled "Re-Employment" which provides that, "I agree that I am not eligible for re-employment with the Company, and I agree not to seek employment with the Company at any time in the future. I agree that any denial of employment by the Company is keeping with the intent of this Agreement and shall not be a legitimate basis for my assertion of a claim of discrimination or retaliation."

22. The Release also contains a provision which provides, "To the extent I may have the right to have a union steward or another hourly paid employee witness my voluntary resignation of employment with the Company through this voluntary severance program, I am waiving that right by signing below."

23. The Release further provides that it is irrevocable unless it is revoked in writing within seven (7) calendar days after it is executed.

24. Another document provided to O'Brien from Bordoni is titled draft "Driver Choice Program Personalized Statement." It provides, in part, that, "Your DCP Separation Agreement will not be valid until this seven (7)-calendar-day period expires. Once this period has elapsed, *your acceptance of the DCP Separation Agreement is irrevocable*." (Emphasis added). A copy of the draft Driver Choice Program Personalized Statement is attached as **Exhibit 5**.

25. On or around January 27, 2026, O'Brien sent Bordoni a "Request for Information" related to the DCP. In the January 27 letter, O'Brien wrote, in part, that, "Having just learned about the DCP, the Union's initial position is that this proposed program violates obligations under the

National Master Agreement and may not be unilaterally implemented without the Union's agreement." The Request for Information included fifty-five (54) separate requests for information and documents so that the Union could "more fully understand what is being proposed". A copy of the January 27 Request for Information is attached as **Exhibit 6**.

26. On or around January 30, 2026, Bordoni sent O'Brien a three-page response to the January 27 Request for Information. Bordoni provided O'Brien with limited additional information about the DCP, attached the same DCP materials previously provided, but did not provide *any* of the documents requested by O'Brien, and did not provide responses to the vast majority of the 54 enumerated requests for information. Bordoni wrote, in part, that "As communicated previously, the current plan is to mail DCP materials to employees beginning on February 11, 2026." A copy of the January 30 response letter by Bordoni is attached as **Exhibit 7**.

27. On or around February 3, 2026, O'Brien sent Bordoni a letter identifying the specific requests that UPS did not address or answer in its January 30 response. O'Brien also submitted several follow-up requests for information related to the information that was provided in the January 30 letter. In the February 3 letter, O'Brien reiterated that the Union "need[s] the requested information to make an informed decision whether the proposed "driver choice program" violates the National Master Agreement or its Supplements and Riders." O'Brien also wrote, "Once I have received and had an opportunity to review all of the requested information, I will be reaching out to set up a meeting to discuss further. The Union continues to maintain our position that the DCP likely violates the NMA as well provisions of various regional supplemental agreements, and therefore cannot be implemented without the Union's approval. **Accordingly, please confirm that UPS will not directly bargain with our members or unilaterally implement the DCP unless and until the Union has the opportunity to review the requested**

**information and meet to discuss the DCP.**" (Emphasis in original). A copy of O'Brien's February 3 letter to Bordoni is attached as **Exhibit 8**.

28. On or around February 6, 2026, Bordoni sent O'Brien a two-page response to the February 3 letter in which Bordoni provided some clarification to the Union's follow-up requests, but again failed to provide the vast majority of the requested items asserting for the first time that "[t]he remaining information you continue to seek does not appear relevant to whether the DCP violates the NMA," and that certain requests "raise significant confidentiality concerns for which we will need to utilize a confidentiality agreement, as we have in the past." The February 6 letter concludes by communicating UPS' intent to proceed with its implementation of the DCP program according to the same timeline, despite not having provided the Union's requested information or meeting with the Union. Additionally, and most significantly, Bordoni's letter acknowledges that the Union's grievance is arbitrable. A copy of Bordoni's February 6 letter to O'Brien is attached as **Exhibit 9**.

## The Union's Grievance

29. Later on February 6, 2026, the Union filed a grievance under Article 8 of the NMA alleging that UPS' implementation of the DCP violates Articles 1, 3, 4, 6, 22, and 26 of the NMA and the layoff/reduction-in-force procedures in the local supplemental agreements/riders (the "Grievance"). A copy of the Grievance is attached as **Exhibit 10**.

## UPS Driver Voluntary Severance Plan

30. In July 2025, UPS unilaterally implemented a similar program, which it called the "Driver Voluntary Severance Plan" ("DVSP"). The DVSP was offered to thousands of bargaining unit feeder drivers and package car drivers across the country and provided $1,800.00 in severance pay per year of service, with a $10,000.00 minimum, to any eligible employee who voluntarily

9

relinquished his or her employment with UPS.

31. Similar to the DCP, participating in the DVSP required each individual employee to enter into a separation agreement, prepared entirely by UPS without the Union's involvement, where the employee agreed to separate from his or her employment with UPS, refrain from seeking future employment with UPS, and irrevocably and unconditionally release any and all claims he or she may have against UPS in exchange for a lump sum severance payment. Under the heading, "Review, Acceptance, and Revocation," item 4(k) of the DVSP Separation Agreement stated, "If UPS and I mutually agree on a different DVSP Separation Date than the one originally established, I will not forfeit benefits provided under the DVSP."

32. Just like with the DCP, UPS established the DVSP program and offered the DVSP Separation Agreement directly to bargaining unit employees without notifying, bargaining, or attempting to bargain with the Union.

33. In response to UPS' unilateral implementation of the DVSP, Teamster Local Unions around the country filed numerous grievances alleging violations under the NMA. Many of those grievances have been processed through the various local and regional grievance panels. At least one of those grievances is scheduled to be presented to the upcoming National Grievance Committee, which will meet in March 2026. Under the NMA Article 8 grievance procedure, if the National Grievance Committee fails to reach a majority decision, or deadlocks, either party has the right to advance the grievance to binding arbitration. Because neither party's position has changed, the Union fully expects the DVSP grievance to deadlock and be advanced to arbitration.

## Claim for Relief and Request for
## Temporary Restraining Order and Preliminary Injunction

34. The Union realleges and incorporates by reference the allegations set forth above.

35. UPS' actions in implementing the DCP and offering the same to bargaining unit employees constitutes a breach of the NMA.

36. Article 6, Section 1 of the NMA provides that, "Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void." The DCP – and the documents that must be executed by bargaining unit employees to participate in the DCP, including but not limited to the Release - constitute an "agreement or contract with [UPS'] employees" that "conflicts with the provisions of [the NMA]."

37. Specifically, the DCP violates several provisions of the NMA, including, *inter alia*, Articles 1, 3, 4, 6, 22, and 26. The DCP also violates the layoff/reduction-in-force procedures set forth in the local supplemental agreements/riders, including, but not limited to, Article 57, Section 3 of the New England Supplemental Agreement.

38. In order to participate in the DCP, employees must execute the Release, whereby, *inter alia*, they resign their employment with UPS and agree to never seek reemployment with UPS. The release is irrevocable after the revocation periods expires.

39. UPS' actions in implementing the DCP is causing the Union, and the bargaining unit employees it represents, irreparable harm. Employees are offered a significant lump sum amount in exchange for, *inter alai*, resigning their employment, waiving their rights to meet with a Union steward, and waiving their right to ever re-apply to, and work for, UPS in the future. The Release is irrevocable after the 7-day revocation periods expires.

40. The Union has filed a grievance challenging the DCP, but the Union will suffer

irreparable harm if the DCP is not enjoined because by the time the Grievance has been processed through Article 8 of the NMA, the DCP window period will have closed and employees who signed the Release will be unable to revoke their acceptance and will have received the DCP lump sum payment.

41. Upon information and belief, thousands of UPS bargaining unit employees will be induced to execute the unlawful Release.

42. Because of the time delays involved in processing the Grievance through Article 8 of the NMA, including scheduling and holding an arbitration hearing and obtaining a final decision from an arbitrator, the Grievance cannot be fully processed before the DCP window period and 7-day revocation periods ends, making the contractual dispute resolution mechanism contained in the NMA ineffective. In other words, "arbitration, unassisted by a status quo injunction, would be no more than 'a hollow formality.'" *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Manuf. Co.*, 864 F.2d 927, 931 (1st Cir. 1988) (quoting *Lever Bros. Co. v. Int'l Chem. Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976)).

43. The layoff of potentially thousands of bargaining unit employees through the DCP, combined with the repudiation of the NMA, coupled with the irrevocability of the Release, would render any eventual arbitration award meaningless and thus would result in irreparable harm to the Union and the bargaining unit members it represents.

44. The Union and the bargaining unit employees it represents have no adequate remedy at law to address the irreparable harm the bargaining unit employees will suffer as a result of UPS' contractual violations.

45. A Temporary Restraining Order and Preliminary Injunction ordering UPS to cease implementation of the DCP until the Grievance can be completely processed and resolved through

the contractual grievance and arbitration procedure is necessary to protect the integrity of the grievance process and to protect the contractual rights of the affected bargaining unit employees.

46. The Union is willing to expedite the processing of the Grievance to arbitration should the Court grant injunctive relief.

**WHEREFORE**, Plaintiffs respectfully prays that this Court award the following relief:

a) Issue a temporary restraining order and preliminary injunction ordering Defendant UPS to refrain from and cease implementation of the DCP pending the earlier of the resolution of the grievances concerning the DVSP and the DCP through the NMA grievance and arbitration procedures;

b) Order that any and all Releases and other DCP participation documents executed by bargaining unit employees are null and void pending the earlier of the resolution of the grievances concerning the DVSP and the DCP through the NMA grievance and arbitration procedures;

c) Order Defendant UPS to expeditiously process the DVSP grievances and the Grievance through the contractual grievance procedure and to comply with the duly issued arbitration award;

d) Order Defendant UPS to pay all costs of this litigation, including court costs and Plaintiffs' reasonable attorney's fees, for UPS' willful and bad faith conduct; and

e) Award Plaintiffs such other relief as the Court deems just and proper.

Date: February 9, 2026                    Respectfully submitted,

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS and TEAMSTERS UPS NATIONAL NEGOTIATING COMMITTEE,**

By their Attorneys,

/s/ Michael A. Feinberg
Michael A. Feinberg, Esq.
BBO# 161400
Feinberg, Dumont & Brennan
177 Milk Street, Suite 300
Boston, MA 02109
(617) 338-1976 (t)
(617) 338-7070 (f)
maf@fdb-law.com

/s/ Michael N. Najjar
Michael N. Najjar, Esq.
BBO # 713480
Feinberg, Dumont & Brennan
177 Milk Street, Suite 300
Boston, MA 02109
Tel.: (617) 338-1976
Fax: (617) 338-7070
mnn@fdb-law.com

/s/ Sara P. Sullivan
Sara P. Sullivan, Esq.
BBO # 713700
Feinberg, Dumont & Brennan
177 Milk Street, Suite 300
Boston, MA 02109
Tel.: (617) 338-1976
sps@fdb-law.com

## VERIFICATION

I, Johnnie Sawyer, being duly sworn, hereby declare under the penalties of perjury as follows:

I am the Coordinator of the International Brotherhood of Teamsters Package Division. I have read the Verified Complaint herein. I have personal knowledge of the factual allegations set forth in the foregoing Verified Complaint and I verify that the allegations are true and correct to the best of my knowledge, information and belief.

/s/ Johnnie Sawyer<br>
Johnnie Sawyer

## CERTIFICATE OF SERVICE

I, Michael A. Feinberg, hereby certify that on this 9th day of February 2026, a true copy of the forgoing document was served on the below via email as follows:

John F. Ring, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
john.ring@morganlewis.com

Dated:  February 9, 2026                                  /s/ Michael A. Feinberg
                                                         Michael A. Feinberg. Esq.