## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS and TEAMSTERS UPS NATIONAL NEGOTIATING COMMITTEE,** | |
| Plaintiffs, | |
| **v.** | **CIVIL ACTION NO.:** |
| **UNITED PARCEL SERVICE, INC.,** | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

Plaintiffs International Brotherhood of Teamsters ("IBT") and Teamsters UPS National Negotiating Committee (together the "Union"), hereby submit this Memorandum of Law in Support of Plaintiffs Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction. Plaintiffs move this Court to issue an Order temporarily restraining Defendant, United Parcel Service, Inc. ("UPS" or the "Company") from implementing its incentive-based voluntary separation Driver Choice Program ("DCP"), pending resolution through the grievance and arbitration procedures of the National Master United Parcel Service Agreement (the "NMA").  The DCP was developed and implemented unilaterally, without prior notice to or bargaining with the Union.  Despite the Union's clear position that the DCP violates the NMA,

UPS advised its intent to proceed with distributing DCP materials directly to bargaining unit employees on February 11, 2026.  In response to UPS' stated intent to move forward, the Union filed a grievance on February 6, 2026, protesting UPS' implementation of an extra-contractual agreement with bargaining unit employees that violates the terms of the NMA and Local Union supplemental agreements/riders.

Absent injunctive relief, the Union and its members will suffer irreparable harm, as more fully set forth below.  If UPS seeks to reduce its workforce, it already has a clear mechanism to do so under the Local Union supplemental agreements/riders governing layoffs and reductions-in-force. Instead, UPS has chosen to induce employees to resign through the DCP, bypassing the Union completely and ensuring irreversible harm before arbitration can occur.  The factors here overwhelmingly favor injunctive relief to preserve the status quo and prevent arbitration from becoming a meaningless exercise.

## II.     STATEMENT OF THE FACTS

### A.     The Parties' Collective Bargaining Agreement

The factual background of this action is set forth in Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief.  *See* Pls.' V. Compl. UPS is engaged in the business of shipping and receiving and supply chain management. The Union and UPS are parties to a collective bargaining agreement — the "National Master United Parcel Service Agreement" — covering the terms and conditions of employment of feeder drivers, package drivers, sorters, loaders, unloaders, porters, office clerical, clerks, customer counter clerks, mechanics, maintenance personnel (building maintenance), car washers, and certain other employees of UPS.  Pls.' V. Compl. at ¶ 7;

Ex. 1 to Pls.' V. Compl.[1]  In addition to the NMA, employees of UPS are covered by local supplemental agreements/riders based on the geographic location of their workplace (e.g., New England, Central Region, Western Region, and Southern Region). The supplemental agreements/riders contain the negotiated procedures governing bargaining unit employee layoffs and/or reductions-in-force. *Id*. at ¶ 16.

Article 6, Section 1 of the NMA provides, in part, that, "Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void." *Id*. at ¶ 9.

Article 1 of the NMA provides, in part, that UPS and the Union "enter into this Agreement with a mutual intent of preserving and protecting work and job opportunities for the employees covered by this Agreement." *Id*. at ¶ 10. Article 3, Section 1 of the NMA provides, in part, that UPS "recognizes and acknowledges that the National Union Committee and Local Unions affiliated with the International Brotherhood of Teamsters are the exclusive representatives of all employees of the Employer in covered classifications." *Id*. at ¶ 11. Article 3, Section 7(a) of the NMA provides, in part, that UPS "shall make every reasonable effort to maintain a sufficient

---

[1] The NMA is attached as Exhibit 1 to Plaintiffs' Verified Complaint.  It contains provisions setting forth wage rates, benefits, vacations, holidays, and other negotiated terms and conditions. The NMA also includes in Article 8 a grievance and arbitration procedure that establishes a process for addressing all grievances relating to violations or infractions of the Contract and/or questions of interpretation arising under the provisions of the NMA . The grievance procedure culminates in an arbitration hearing before a neutral, third-party arbitrator selected through procedures established by the Federal Mediation and Conciliation Service. Under Article 8, arbitration decisions are "final and binding" on the Union and UPS. Pls.' V. Compl. at ¶ 7.

workforce to staff its operations with bargaining unit employees." *Id*. at ¶ 12.

Article 4 of the NMA is titled "Stewards." It provides, in part, that, "When requested by the Union or the employee, there shall be a steward present whenever [UPS] meets with an employee *concerning* grievances or discipline or investigatory interviews. In such cases, the meeting shall not be continued until the steward or alternate steward is present." (Emphasis added). *Id*. at ¶ 13. Article 22, Section 3 of the NMA provides, in part, that UPS has "the obligation to create at least seventy-five hundred (7500) new full-time jobs from existing parttime jobs during the last three years of [the NMA] throughout its operations covered by [the NMA]; one thousand (1000) in the third year of the contract; three thousand (3000) in the fourth year; and thirty-five hundred (3500) in the fifth year of this Agreement." *Id*. at ¶ 14. Section 3 goes on to provide that, "The number of full-time jobs created under Article 22, Section 3 of the 1997-2002, the 2002-2008, the 2013-2018 and the 2018-2023 Agreements shall not be reduced." *Id*. In Article 26, Section 2 of the NMA, UPS and the Union established a "Joint UPS/IBT Competition Committee", the purpose of which is "discussing and evaluating proposals which, if adopted by the Committee, could create additional bargaining unit jobs, enable [UPS] to more effectively compete with other companies, implement new services and products, or change existing services." *Id*. at ¶ 15.

In addition to the NMA, employees of UPS are covered by local supplemental agreements and riders based on the geographic location of their workplace (e.g., New England, Central Region, Western Region, and Southern Region). The supplemental agreements and riders contain the negotiated procedures governing bargaining unit employee layoffs and/or reductions-in-force. *Id*. at ¶ 16. UPS bargaining unit employees working in Massachusetts are covered by the New England Supplemental Agreement. *Id*.; *see* Ex. 2 to Pls.' V. Compl.

4.

Article 57, Section 3 of the New England Supplemental Agreement sets forth the procedures to be followed when UPS decides to lay off bargaining unit employees. Article 57, Section 3 contains a detailed "bumping" process that must be followed in the event of "an extended layoff" of bargaining unit employees, whereby more senior are permitted to "bump" (i.e., displace) less senior employees from their positions if they are subject to a layoff. Pls.' V. Compl. at ¶ 17. The other NMA Supplemental Agreements contain similar layoff machinery. UPS has exercised its rights under this language many times, laying off hundreds of bargaining unit employees since the most recent iteration of the NMA took effect on August 1, 2023. *Id.*

### B. UPS Driver Choice Program

On or about January 9, 2026, UPS, through its President, Global Labor Relations and Deputy General Counsel, Labor, Daniel P. Bordoni informed IBT General President Sean O'Brien that UPS intended to offer bargaining unit employees the opportunity to participate in the DCP, whereby eligible employees would receive a lump sum payment in exchange for, *inter alia*, resigning their employment, waiving all legal claims against UPS, and agreeing not to seek employment with UPS at any time in the future. *Id.* at ¶ 18; *see* Ex. 3 to Pls.' V. Compl. UPS informed the Union that it intended to mail DCP materials to employees beginning on February 11, 2026, and that the window for employees to elect to participate in the DCP is from February 13 to March 12, 2026. *Id.* at ¶ 18. UPS developed and created the DCP without notice to, and bargaining with, the Union. The Union was informed of the existence of the DCP after all material terms of the DCP were finalized by UPS, and the DCP was presented to the Union as a *fait accompli*. *Id.* at ¶ 19.

In order to participate in the DCP, UPS employees must execute a "DCP Separation

Agreement and Release" (the "Release"). *Id*. at ¶ 20; *see* Ex. 4 to Pls.' V. Compl. The Release contains a provision titled "Re-Employment" which provides that, "I agree that I am not eligible for re-employment with the Company, and I agree not to seek employment with the Company at any time in the future. I agree that any denial of employment by the Company is keeping with the intent of this Agreement and shall not be a legitimate basis for my assertion of a claim of discrimination or retaliation." *Id*. at ¶ 21. The Release also contains a provision which provides, "To the extent I may have the right to have a union steward or another hourly paid employee witness my voluntary resignation of employment with the Company through this voluntary severance program, I am waiving that right by signing below." *Id*. at ¶ 22. The Release further provides that it is irrevocable unless it is revoked in writing within seven (7) calendar days after execution. *Id*. at ¶ 23.

On or around January 27, 2026, O'Brien sent Bordoni a "Request for Information" related to the DCP. In the January 27 letter, O'Brien wrote, in part, that, "Having just learned about the DCP, the Union's initial position is that this proposed program violates obligations under the National Master Agreement and may not be unilaterally implemented without the Union's agreement." The Request for Information included fifty-five (54) separate requests for information and documents so that the Union could "more fully understand what is being proposed." *Id*. at ¶ 25; *see* Ex. 6 to Pls.' V. Compl.

On or around January 30, 2026, Bordoni sent O'Brien a three-page response to the January 27 Request for Information. Bordoni provided O'Brien with limited additional information about the DCP, attached the same DCP materials previously provided, but did not provide *any* of the documents requested by O'Brien and did not provide responses to the vast majority of the 54

enumerated requests for information. Bordoni wrote, in part, that "As communicated previously, the current plan is to mail DCP materials to employees beginning on February 11, 2026."  Pls.' V. Compl. at ¶ 26.

On or around February 3, 2026, O'Brien sent Bordoni a letter identifying the specific requests that UPS did not address/answer in its January 30 response. O'Brien also submitted several follow-up requests for information related to the information that was provided in the January 30 letter. In the February 3 letter, O'Brien reiterated that the Union "need[s] the requested information to make an informed decision whether the proposed 'driver choice program' violates the National Master Agreement or its Supplements and Riders." O'Brien also wrote that, "Once I have received and had an opportunity to review all of the requested information, I will be reaching out to set up a meeting to discuss further. The Union continues to maintain our position that the DCP likely violates the NMA as well provisions of various regional supplemental agreements, and therefore cannot be implemented without the Union's approval. **Accordingly, please confirm that UPS will not directly bargain with our members or unilaterally implement the DCP unless and until the Union has the opportunity to review the requested information and meet to discuss the DCP.**" (Emphasis in original). *Id*. at ¶ 27; *see* Ex. 8 to Pls.' V. Compl.

On or around February 6, 2026, Bordoni sent General President O'Brien a two-page response to the February 3 letter in which Bordoni provided some clarification to the Union's follow-up requests, but again failed to provide the vast majority of the requested items asserting for the first time that "[t]he remaining information you continue to seek does not appear relevant to whether the DCP violates the NMA," and that certain requests "raise significant confidentiality concerns for which we will need to utilize a confidentiality agreement, as we have in the past."

7.

Pls.' V. Compl. at ¶ 28; Ex. 9 to Pls.' V. Compl. The February 6 letter concludes by communicating UPS' intent to proceed with its implementation of the DCP program according to the same timeline, despite not having provided the Union's requested information or meeting with the Union. *Id*.

### C.    The Union's Grievance

Later that same day on or around February 6, 2026, the Union filed a grievance under Article 8 of the NMA alleging that UPS' implementation of the DCP violates Articles 1, 3, 4, 6, 22, and 26 of the NMA and the layoff/reduction-in-force procedures in the local supplemental agreements and riders (the "Grievance"). Pls.' V. Compl. at ¶ 29, *see* Ex. 10 to Pls.' V. Compl.

### D.    UPS Driver Voluntary Severance Plan

In July 2025, UPS unilaterally implemented a similar program, which it called the "Driver Voluntary Severance Plan" ("DVSP"). Pls.' V. Compl. at ¶ 30. The DVSP was offered to thousands of bargaining unit feeder drivers and package car drivers across the country and provided $1,800.00 in severance pay per year of service, with a $10,000.00 minimum, to any eligible employee who voluntarily relinquished his or her employment with UPS. *Id.*

Similar to the DCP, participating in the DVSP required each individual employee to enter into a separation agreement, prepared entirely by UPS without the Union's involvement, where the employee agreed to separate from his or her employment with UPS, refrain from seeking future employment with UPS, and irrevocably and unconditionally release any and all claims he or she may have against UPS in exchange for a lump sum severance payment. Pls.' V. Compl. at ¶ 31. Under the heading, "Review, Acceptance, and Revocation," item 4(k) of the DVSP Separation Agreement stated, "If UPS and I mutually agree on a different DVSP Separation Date than the one

originally established, I will not forfeit benefits provided under the DVSP." *Id.* Just like with the DCP, UPS established the DVSP program and offered the DVSP Separation Agreement directly to bargaining unit employees without notifying, bargaining, or attempting to bargain with the Union. *Id.* at ¶ 32.

In response to UPS' unilateral implementation of the DVSP, Teamster Local Unions around the country filed numerous grievances alleging violations under the NMA. Pls.' V. Compl. at ¶ 33. Many of those grievances have been processed through the various local and regional grievance panels. *Id.* At least one of those grievances is scheduled to be presented to the upcoming National Grievance Committee, which will meet in March 2026. *Id.* Under the NMA Article 8 grievance procedure, if the National Grievance Committee fails to reach a majority decision, or deadlocks, either party has the right to advance the grievance to binding arbitration. *Id.* Because neither party's position has changed, the Union fully expects the DVSP grievance to deadlock and be advanced to arbitration. *Id.*

## III.    ARGUMENT

"The Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 (1982), sets forth the '[f]ederal labor law policy prohibiting injunctions in peaceful labor disputes over arbitral issues[.]'" *Nat'l Ass'n of Gov't Emps., Inc. v. Nat'l Emergency Med. Servs. Ass'n, Inc.*, 969 F.Supp.2d 59, 68 (D. Mass. 2013) (quoting *Teachers Ass'n of Japanese Educ. Inst. of N.Y., Inc. v. Japanese Educ. Inst. of N.Y.*, 724 F.Supp. 188, 191 (S.D.N.Y.1989)). However, in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970), the U.S. Supreme Court "allowed courts to consider the propriety of an injunction where necessary to preserve the arbitral process." *Nat'l Ass'n*, 969 F.Supp.2d at 68-69 (quoting *Teachers Ass'n*, 724 F.Supp. at 191). "Courts have also recognized 'reverse *Boys*

9.

*Markets* injunctions,' or injunctions against employers to maintain the status quo in a labor dispute pending arbitration." *Id*. Put simply, a reverse *Boys Market* injunction permits a union to enjoin an employer from taking action that the union asserts is violative of the parties' collective bargaining agreement while the parties submit their dispute to arbitration.

A reverse *Boys Market* injunction can only be obtained when the status quo must be preserved pending the outcome of the arbitration. In other words, in those instances that threaten to make "a hollow formality" of the grievance and arbitration process in a collective bargaining agreement. *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Manuf. Co.*, 864 F.2d 927, 931 (1st Cir. 1988); *Machinists Local Lodge 1266 v Panoramic Corp.*, 668 F.2d 276, 283-84 (7th Cir. 1981) (adopting the "frustration of arbitration" standard and citing numerous cases for the proposition that "it is well-established that federal courts after *Buffalo Forge*[2] retain the authority, in aid of arbitration, to enjoin employer actions"); *Lever Bros. Co. v. Int'l Chem. Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976); *Oil, Chemical and Atomic Workers Local 2-286 v Amoco Oil Co.*, 885 F.2d 697 (10th Cir. 1989).

In the First Circuit, for a union to obtain a reverse *Boys Market* injunction to enjoin an employer's action while the parties submit a grievance to arbitration, it "must first show that its grievance is arbitrable." *International Brotherhood of Teamsters, Local Union No. 251 v. Almac's, Inc.*, 894 F.2d 464, 465 (1st Cir. 1990) (citing *Boys Market*, 398 U.S. at 247-49). Next, "the Union must demonstrate the necessity of an injunction to preserve the arbitration." *Id*. (citing *Procter & Gamble*, 864 F.2d at 932). Finally, "the Union must show that irreparable harm and imbalanced hardships would result without the injunction[,]" which means that "without the injunction, the

---

[2]  *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397 (1976).

arbitration would become meaningless." *Id*. (citing *Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976)). "Irreparable injury does not mean simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather injury so irreparable that a decision of the [arbitrator] in the union's favor would be but an empty victory." *Id*. at fn.2 (quoting *Local Lodge No. 1266, International Association of Machinists and Aerospace Workers, AFL–CIO v. Panoramic Corp*., 668 F.2d 276, 285–86 (7th Cir. 1981) (internal quotations and brackets omitted)).

### A.    The Standard for a Reverse *Boys Market* Injunction Has Been Met

#### 1.    The Grievance is Arbitrable

The U.S. Supreme Court and First Circuit have recognized that when a contract contains an arbitration clause, there is a "presumption of arbitrability," *Johnson Controls Sec. Sols., LLC v. Int'l Bhd. of Elec. Workers, Loc. 103*, 24 F.4th 87, 90 (1st Cir. 2022) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 650, (1986)). When evaluating whether a grievance is subject to a collective bargaining agreement's arbitration clause, the presumption in favor or arbitration cannot be rebutted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id*. In determining whether a specific dispute falls within the substantive scope of a collective bargaining agreement between parties, the Supreme Court has held that the presumption of arbitrability is particularly applicable when the arbitration clause is broad, such as when it provides for arbitration of "any differences arising with respect to the interpretation of this contract and the performances of any obligation hereunder... " *AT&T,* 475 U.S. at 650.

Here, the Union's Grievance, filed on February 9, is without question arbitrable and within

the scope of Article 8 of the NMA. The Union alleges that numerous provisions of the NMA – Articles 1, 3, 4, 6, 22, and 26 as well as the layoff/reduction-in-force procedures in the local supplemental agreements and riders – are violated by the DCP. Ex. 9 to Pls.' V. Compl. Article 8 of the NMA provides that the "National Grievance Procedure" shall be used to resolve "[a]ll grievances and/or questions of interpretation arising under the provisions of this National Master Agreement[.]" Ex. 1 to Pls.' V. Compl. (Art. 8, Sec. 1). The Grievance alleges numerous violations of "provisions" of the NMA, and thus the Grievance fits squarely within the type of disputes covered by Article 8 of the NMA and is clearly arbitrable.

Significantly, in Bardoni's February 6, 2026 letter, UPS expressly concedes that the question of whether the DVSP and DCP violate the NMA is arbitrable. Bardoni's letter states, in part:

> … the Union consistently has taken the position that the proposed DCP violates the NMA. The Union has taken the same position with respect to the DVSP. This is an issue to be resolved in the grievance process. It is not a reason to delay the roll-out of the DCP.

Therefore, the first requirement for a reverse *Boys Market* injunction is satisfied.

### 2.    An Injunction of the DCP is Necessary to Preserve the Arbitration, and the Union will Suffer Irreparable Harm Absent an Injunction

As the Seventh Circuit Court of Appeals explained in *Local Lodge No. 1266, IAM v. Panoramic Corp.*, the practice of most federal courts when evaluating a request for a reverse *Boy Market* injunction is to "focus into a single concept the twin ideas of irreparable injury and frustration of arbitration." 668 F.2d 276, 286 (7th Cir. 1981). Here, a reverse *Boys Market* injunction is necessary to preserve the arbitration of the Grievance and prevent irreparable harm to the Union, because if the status quo is not preserved while the Grievance is arbitrated, UPS will

proceed with offering the DCP to bargaining unit employees and a significant number of employees will execute irrevocable releases which will resign their employment and prohibit them from reapplying to UPS. Once bargaining unit employees execute a Release - which is required to participate in the DCP - such action cannot be undone. Those employees will be removed from the bargaining unit, and their seniority rights will be extinguished.  Any funds the employees receive as part of the DCP will, in all likelihood, be spent by the employees or otherwise incapable of being recaptured by UPS. An arbitrator would not be able to compel UPS to reinstate employees who have been induced to voluntarily resign or to refund the money paid to them.  Therefore, if the status quo is not preserved while an arbitrator decides whether the DCP violates the NMA, an eventual decision by an arbitrator sustaining the Grievance will be an "empty victory" because by the time the award is issued, the window for participating in the DCP will have closed and potentially thousands of bargaining unit employees will have executed the irrevocable Release. *See Aluminum Workers International Union, AFL–CIO, Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437 (6th Cir. 1982) (explaining that "[i]rreparable harm is injury so great that an arbitrator's award … would be inadequate to fully recompense the injured party [and] renders the award an 'empty victory[.]'") (quoting *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad*, 363 U.S. 528, 534 (1960)).

In *Proctor and Gamble*, the First Circuit agreed with the approach of numerous other circuit courts that a reverse *Boys Market* injunction is appropriate to preserve "the status quo in order to save the arbitration clause." 864 F.2d at 931. The court relied, in part, on the Fourth Circuit's decision in *Lever Bros.,* where that court held that a "[f]ailure to maintain the status quo … would have allowed the company to complete its planned maneuver (in that case, moving the

13.

facility out of state), thus presenting the union with a *fait accompli*." *Id.* (citing 554 F.2d at 122). The court agreed with the Fourth Circuit's reasoning that permitting the company to take the challenged action "unassisted by a status quo injunction" would make "arbitration […] no more than "a hollow formality."" *Id.* (quoting 554 F.2d at 123).

Like in *Lever Bros.,* if UPS is allowed to offer the DCP to bargaining unit employees, the arbitration clause of the NMA will be vitiated and arbitration of the Grievance will be no more than "a hollow formality". *Id.*; *National Ass'n*, 969 F. Supp at 69 ("an 'injunction in aid of arbitration is appropriate only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration."") (quoting *United Gov't Sec. Officers of Am. Int'l Union v. Serv. Employees Int'l Union*, 646 F.Supp.2d 91, 94 (D.D.C. 2009)). If UPS is permitted to solicit bargaining unit employees' participation in the DCP and have them sign irrevocable agreements to resign their employment, an arbitrator's award finding that the DCP violates the NMA will be meaningless, because an arbitrator appointed under the NMA has no authority to nullify an executed Release.

Article 8 of the NMA provides that an arbitrator's authority is limited to "apply[ing] the provisions of [the] Agreement and … render[ing] a decision on any grievance coming before them." Thus, an arbitrator *does not* have the authority to nullify or invalidate an extra-contractual agreement such as the Release.[3] Therefore, once an employee executes the Release, and the revocation period expires, it will be binding on the employee notwithstanding an arbitrator's award

---

[3] Moreover, by signing the Release, an employee agrees that "the substantive laws of the state of Georgia govern this Agreement in all respects. I further agree that the exclusive forum for any action to enforce this Agreement, as well as any action relating to or arising out of this Agreement, shall be the state or federal courts of the State of Georgia." Ex. 4 to Pls.' V. Compl. This further shows that an arbitrator appointed under the NMA has no authority to revoke an executed Release.

14.

that finds that the DCP violates the NMA.

Critically, employees who resign pursuant to the DCP will lose valuable, bargained for benefits tied directly to their status as bargaining unit employees. These include pension accruals, and eligibility for future retirement benefits. Benefits may also include participation in jointly trusteed health and welfare plans, which provide medical and dental coverage for employees and their families. The loss of these benefits constitutes irreparable harm. Pension benefits are time-dependent and once an employee is removed from the bargaining unit, future accruals cease. Likewise, the loss of health coverage cannot be retroactively repaired once coverage terminates and employees are forced to seek alternatives or go without health care.

Bargaining unit employees who resign pursuant to the DCP permanently forfeit their bargaining unit status and all earned seniority rights. Seniority rights govern layoffs, recall rights promotions, shift bids and access to future job opportunities. Article 57, Section 6 of the New England Supplemental Agreement delineates the limited and specific circumstances under which an employee may lose seniority, including, as relevant here, through discharge, "voluntary quit," or layoff in excess of six (6) years.  By structuring the DCP to induce employees to "voluntarily quit", UPS ensures the immediate and irrevocable extinguishment of seniority rights in a manner that bypasses the negotiated layoff provisions of the Local Union supplemental agreements/riders.

Where employees voluntarily resign, the arbitrator's remedial authority is non-existent. The arbitrator cannot undo the legal consequences of resignation or compel the recreation of seniority rights, pension accruals and health benefit eligibility which depend on continuous service. As a result, a reverse *Boys Market* injunction is essential "to prevent arbitration from being rendered a meaningless ritual." *Panoramic*, 668 F.2d at 283.

15.

### 3.    The Traditional Elements for Injunctive Relief are also Satisfied

In *National Ass'n,* this Court held that "[i]n the context of a labor dispute, the injunction must meet "all the usual criteria for injunctive relief, including irreparable injury, likelihood of success on the merits, balancing of the equities, and consideration of the public interest." 969 F.Supp.2d at 71 (citing *Verizon N.E., Inc. v. Int'l Bhd. of Elec. Workers, Local 2322*, 651 F.3d 176, 184 (1st Cir.2011)). As argued above, the Union will face irreparable injury absent an injunction because of the irrevocable nature of the Release. The other traditional elements for an injunction are also satisfied as shown below.

### a.    Likelihood of Success on the Merits

In cases involving injunctions pending arbitration of labor disputes, "courts have held that the party moving for a preliminary injunction in the labor context 'need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor.'" *Id*. (citing *Panoramic Corp.*, 668 F.2d at 284-85). Here, as discussed above, the Union has alleged violations of numerous contractual provisions, and there is a genuine dispute as to whether the DCP violates the NMA and/or the local supplemental agreements/riders. The NMA clearly states in Article 6 that UPS cannot enter into an individual contract with a bargaining unit employee "which *in any way* conflicts with the provisions of this Agreement" (emphasis added). Ex. 1 to Pls.' V. Compl. at Art. 6, Sec. 1. In its February 6, 2026 Grievance, the Union has alleged that the DCP conflicts with the NMA in *numerous ways*. Specifically, the Union alleges that the DCP violates UPS's obligations to:

1) Preserve and protect job opportunities for bargaining unit employees (Article 1);

2) Recognize and respect the Union's status as "exclusive representatives of all employees of the Employer in covered classifications" (Article 3, Section 1);

16.

3) Maintain a sufficient workforce to staff its operations with bargaining unit employees. (Article 3, Section 7(a));

4) Allow a Union steward to be present when requested *by the Union* whenever UPS meets with an employee *concerning* grievances (Article 4);

5) Create at least seventy-five hundred (7500) new full-time jobs during the last three years of the NMA and to not reduce the number of jobs created under Article 22, Section 3 of the 1997-2002, the 2002-2008, the 2013-2018 and the 2018-2023 Agreements (Article 22, Section 3);

6) Use the joint UPS/IBT Competition Committee to discuss and evaluate proposals (such as the DCP) which could enable UPS to more effectively compete with other companies, implement new services and products, or change existing services. (Article 26, Section 2); and

7) Follow the layoff/reduction-in-force procedures set forth in the local supplemental agreements/riders when reducing the number of bargaining unit employees.

Ex. 10 to Pls.' V. Compl.

Taken together, the Union's position that the DCP, an extra-contractual agreement under Article 6 , violates the NMA and/or the local supplemental agreements/riders "is sufficiently sound to prevent the arbitration from being a futile endeavor," *Panoramic Corp.*, 668 F.2d at 284-85, and therefore the Union has met its obligation of establishing that it is likely to prevail on the merits of its claims.

### b.    Balancing of the Equities

The balancing of the equities "clearly tips" in the Union's favor here. *National Ass'n,* 969 F.Supp.2d at 70. First, the injunction will only last until an arbitrator decides whether the DCP violates the NMA. UPS voluntarily executed the NMA and agreed to not enter into individual contracts with employees that violate the NMA and also agreed to empower an arbitrator with "the authority to apply the provisions of [the NMA] and to render a decision on any grievance coming before them[.]" Ex. 1 to Pls.' V. Compl. at Art. 8, Sec. 6. That is, the Union is not asking UPS to

17.

do something that it has not already agreed to do.

The Union has repeatedly informed UPS that it believes that the DCP violates the NMA and/or local supplemental agreements and riders and asked UPS to refrain from implementing the DCP while it gathered information from the Company and had time to review the same. *See* Ex. 8 to Pls.' V. Compl. Despite this, UPS, in its February 6 letter to O'Brien, reiterated that it is barreling forward with the DCP and has left the Union with no other option, but to go to Court so that it can utilize the grievance machinery in the NMA before the same becomes completely futile. Ex. 9 to Pls.' V. Compl.

Moreover, the harm to UPS will be non-existent if an injunction is issued. The Union is not asking for the Court to change the status quo, but instead is seeking to maintain the status quo while an arbitrator decides if UPS has the authority under the NMA to unilaterally implement the DCP. If an arbitrator rules in UPS' favor, it will be free to offer the DCP to bargaining unit employees. There is demonstrably no urgent need for UPS to eliminate bargaining unit positions because UPS has the right to use the layoff/reduction-in-force procedures in the local supplemental agreements and riders to downsize, but UPS has chosen not to. *See* Ex. 2 to Pls.' V. Compl. at Art. 57, Sec. 3. And should it prove necessary for UPS to eliminate bargaining unit positions, even if an injunction is issued here, the Company remains free to utilize the layoff/reduction-in-force procedures, which it has done on thousands of occasions since the NMA took effect on August 1, 2023. V. Compl. at ¶ 17.

On the other hand, as argued above, if the DCP proceeds, thousands of bargaining unit employees will enter into irrevocable agreements terminating their employment and an arbitrator will be powerless to reverse that action.

Lastly, as described above, the Union already has a pending grievance over UPS' implementation of a similar program to the DCP – the DVSP – which is slated to be presented to the National Grievance Committee in March 2026 and will likely advance to arbitration. Pls.' V. Compl. at ¶¶ 30-33. In other words, with adjudication over the DVSP where many, if not all, of the same legal questions will soon be resolved by an arbitrator, immediate relief and an injunction to preserve the status quo is all the more appropriate. Should an arbitrator find that UPS is correct that offers to resign under the DVSP do not constitute contractual violations, UPS would be vindicated and likely could proceed with implementation of the DCP at issue. On the other hand, should an arbitrator agree with the Union's position as it relates to the DVSP, the implementation of the DCP would become a moot issue.

For these reasons, a balancing of the equities demonstrates that an injunction should issue in favor of the Union.

c.       **Consideration of the Public Interest**

The issuance of an injunction here while the parties arbitrate their dispute is in the public's interest. As argued above, the parties have agreed to arbitrate disputes related to the provisions of the NMA. Allowing UPS to proceed with the irreversible DCP without first allowing the Union to challenge the same through arbitration flies in the face of "the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes[.]" *Boys Markets*, 398 U.S. at 253. Indeed, public policy in favor of arbitration is so strong that the First Circuit has opined that "[i]n the *Boys Markets* environment, arbitrability replaces the fourth factor [the effect on the public interest] entirely …" *Proctor & Gamble*, 864 F.2d at 930 n.3. Therefore, an injunction in favor of the Union requiring UPS to arbitrate the instant dispute is clearly in the

19.

public's interest.

## IV. CONCLUSION

For the foregoing reasons, the Union respectfully requests that the Court issue an Order temporarily restraining UPS from offering the DCP to bargaining unit employees pending resolution of its Grievance through the NMA's grievance and arbitration procedure.

Date: February 9, 2026                                   Respectfully submitted,

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS and TEAMSTERS UPS NATIONAL NEGOTIATING COMMITTEE,**

By their Attorneys,

/s/ Michael A. Feinberg
Michael A. Feinberg, Esq. BBO# 161400
Feinberg, Dumont & Brennan
177 Milk Street, Suite 300
Boston, MA 02109
Tel. : (617) 338-1976
Fax : (617) 338-7070
maf@fdb-law.com

/s/ Michael N. Najjar
Michael N. Najjar, Esq. BBO # 713480
Feinberg, Dumont & Brennan
177 Milk Street, Suite 300
Boston, MA 02109
Tel.: (617) 338-1976
Fax: (617) 338-7070
mnn@fdb-law.com

/s/ Sara P. Sullivan
Sara P. Sullivan, Esq. BBO # 713700
Feinberg, Dumont & Brennan
177 Milk Street, Suite 300
Boston, MA 02109
Tel.: (617) 338-1976
sps@fdb-law.com

## <u>CERTIFICATE OF SERVICE</u>

        I, Michael A. Feinberg, hereby certify that on this 9th day of February 2026, a true copy of the forgoing document was served on the below via email as follows:

John F. Ring, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
john.ring@morganlewis.com


Dated:  February 9, 2026                         /s/ Michael A. Feinberg_____
                                              Michael A. Feinberg. Esq.

21.