**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS and TEAMSTERS UPS NATIONAL NEGOTIATING COMMITTEE,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br><br>**UNITED PARCEL SERVICE, INC.,**<br><br>**Defendant.** | Civ. Action No. 1:26-cv-10666-DJC |

**DEFENDANT UNITED PARCEL SERVICE, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.    The Driver Choice Program.................................................................... 3

    B.    The Dispute between UPS and the Union............................................... 4

    C.    This Litigation Is the Teamsters' Latest Attempt to Conscript the Courts in a Labor Dispute with UPS. ................................................................ 6

ARGUMENT ..................................................................................................... 7

    A.    The Court Lacks Jurisdiction to Issue the Union's Requested Injunction Under the Norris-LaGuardia Act. ........................................................... 8

        1.    The Reverse *Boys Markets* Exception to the Norris-LaGuardia Act Applies Only When Arbitration Would Otherwise Be Meaningless. ......... 8

        2.    The Union Has Failed to Establish That Arbitration Would be Rendered Meaningless if UPS Implements the DCP............................. 10

    B.    The Union Has Failed to Establish the Traditional Equitable Requirements for a Preliminary Injunction................................................................ 15

        1.    The Union Is Unlikely to Succeed on the Merits.................................... 15

        2.    The Union Cannot Identify Any Irreparable Injury................................ 17

        3.    The Balance of Hardships Warrants Denial of The Union's Motion. ............................................................................................ 18

        4.    The Public Interest Supports Denying the Union's Motion. ................... 20

CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aluminum Workers International Union v. Consolidated Aluminum Corp.*,
  696 F.2d 437 (6th Cir. 1982) .......................................................................15, 18, 19

*Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R.R. Co.*,
  363 U.S. 528 (1960) ...........................................................................................12

*Boys Markets, Inc. v. Retail Clerks Union*,
  398 U.S. 235 (1970).................................................................................... passim

*Buffalo Forge Co. v. United Steelworkers of Am.*,
  428 U.S. 397 (1976).............................................................................................9

*Columbia Loc., Am. Postal Workers Union, AFL-CIO v. Bolger*,
  621 F.2d 615 (4th Cir. 1980) .............................................................................13

*Commc'ns Workers of Am., AFL-CIO v. Verizon New York Inc.*,
  2002 WL 31496221 (S.D.N.Y. Nov. 8, 2002) ....................................................13

*Dist. Loc. Union No. 592, United Foods & Com. Workers Intern Union, AFL-CIO v. Catelli-Habitant, Inc.*,
  1989 WL 201079 (D. Mass. Apr. 25, 1989) .......................................................13

*E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
  414 F.3d 700 (7th Cir. 2005) .............................................................................17

*Graphic Comm. Conf.-Int'l Bhd. of Teamsters Loc. 404M v. Bakersfield Californian*,
  541 F. Supp. 2d 1117 (E.D. Cal. 2008)..............................................................17

*Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*,
  864 F.2d 927 (1st Cir. 1988) ........................................................................ passim

*Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.*,
  1988 WL 105625 (D. Mass. Oct. 3, 1988)...............................................9, 14, 15

*Int'l Bhd. of Elec. Workers, Loc. 2327, AFL-CIO v. Consol. Commc'ns of N. New England Co.*,
  2019 WL 7546601 (D. Me. Aug. 23, 2019).........................................................16

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. Union No. 251 v. Almac's, Inc.*,
  894 F.2d 464 (1st Cir. 1990) ........................................................................ passim

*J.I. Case Co. v. NLRB*,
  321 U.S. 332 (1944)...........................................................................................11

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,*
    457 U.S. 702 (1982) ................................................................................................. 1

*Lever Brothers Co. v. Int'l Chemical Workers Union,*
    554 F.2d 115 (4th Cir. 1976) .................................................................................. 15

*Loc. Union 15, Int'l Bhd of Elec. Workers v. Exelon Corp.,*
    191 F. Supp. 2d 987 (N.D. Ill. 2001) ...................................................... 10, 12, 13

*Local Lodge No. 1266 v. Panoramic Corp.,*
    668 F.2d 276 (7th Cir. 1981) .................................................................................. 15

*Loewen Grp. Int'l, Inc. v. Haberichter,*
    65 F.3d 1417 (7th Cir. 1995) .................................................................................. 11

*Nat'l Ass'n of Gov't Emps., Inc. v. Nat'l Emergency Med. Servs. Ass'n, Inc.,*
    969 F. Supp. 2d 59 (D. Mass. 2013) ...................................................................... 15

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.,*
    419 F. Supp. 3d 127 (D.D.C. 2019) ......................................................................... 9

*Nat'l Union of Healthcare Workers v. Children's Hosp. & Rsch. Ctr. at Oakland,*
    2025 WL 1785317 (N.D. Cal. June 27, 2025) ...................................................... 17

*Niagara Hooker Emps. Union v. Occidental Chem. Corp.,*
    935 F.2d 1370 (2d Cir. 1991) ................................................................................. 14

*Otis Elevator Co. v. Int'l Union of Elevator Constructors, Loc. 4,*
    408 F.3d 1 (1st Cir. 2005) ...................................................................................... 20

*Teamsters Loc. 710 v. United Parcel Service, Inc.,*
    No. 1:25-cv-9775 (N.D. Ill. Aug. 15, 2025) (ECF No. 1) ............................... passim

*Textile Workers Union v. Lincoln Mills,*
    353 U.S. 448 (1957) ................................................................................................ 20

*Union de Periodistas, Artes Graficas y Ramas Anexas v. Caribbean Int'l News Corp.,*
    2009 WL 10720190 (D.P.R. Sept. 4, 2009) ........................................................... 13

*Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 2322,*
    651 F.3d 176 (1st Cir. 2011) ........................................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................... 17

STATUTES

Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.* ................................................... passim

## INTRODUCTION

This lawsuit is an improper effort to drag the courts into a labor dispute. In their Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction (Dkt. 2) ("the Motion"), the International Brotherhood of Teamsters and Teamsters UPS National Negotiating Committee (collectively, the "Union") request an injunction to stop United Parcel Service, Inc. ("UPS") from offering a voluntary separation program to its drivers. UPS has agreed not to move forward with the publication or implementation of the program until this Court rules on the Union's Motion. *See* Dkt. 8. As a result, there is no cause for a temporary restraining order; UPS has, in effect, provided such relief voluntarily. To facilitate the efficient and timely resolution of this litigation, UPS asks the Court to rule directly on the request for a preliminary injunction. The Motion should be denied in full. Under controlling law, the Court lacks jurisdiction to issue an injunction in these circumstances.

Through the Norris-LaGuardia Act, 29 U.S.C.§ 101 *et seq.*, Congress greatly restricted courts' jurisdiction to issue injunctions in cases involving a labor dispute. Congress wrote the statute expansively because it "was intent upon taking the federal courts out of the labor injunction business except in … very limited circumstances." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982) (citation and emphasis omitted). The Union comes nowhere close to satisfying any exception. It cites no case granting a comparable injunction. But many cases have *denied* such injunctions—including the Northern District of Illinois just last year in a *nearly identical lawsuit* filed by Teamsters over another UPS voluntary separation program that the Union concedes was a "similar program." Mem. at 8, 19. The reasoning of the Northern District of Illinois court shows why injunction relief is improper here as well, yet the Union does not even mention that case, let alone refute its reasoning.

The Union invokes a narrow, judicially created exception to the Norris-LaGuardia Act, the

"reverse *Boys Markets* exception." This exception is strictly limited to circumstances where an injunction is necessary to keep a union/employer arbitration from becoming an "hollow formality" or "meaningless ritual." *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 2322*, 651 F.3d 176, 184 n.4 (1st Cir. 2011). Here, injunctive relief is not remotely necessary to keep the parties' arbitration from becoming meaningless. The collective bargaining agreement expressly empowers the arbitrator to rescind the voluntary separation program—including the accompanying separation agreements—if the Union persuades the arbitrator that implementing the program violates the collective bargaining agreement. That contractual provision directly refutes the Union's repeated assertion that any voluntary separation agreements would be "irrevocable." Mem. at 13, 14, 15, 16, 18. Because the Union's entire Motion rests on this erroneous premise, the Court lacks jurisdiction to grant it. In situations like this one, where arbitration clearly can provide meaningful relief, numerous decisions from this Circuit and others recognize that the Norris-LaGuardia Act bars courts from enjoining an employer's actions, including a voluntary severance or separation program. And even if the Court had jurisdiction to issue the injunction requested here, doing so would be inappropriate because the Union fails to satisfy the traditional equitable requirements for an injunction.

## BACKGROUND

UPS is a global transportation and logistics company that employs approximately 370,000 employees in the United States, approximately 80% of whom are represented by the Teamsters. Declaration of Michael Clayton ("Clayton Decl."), ¶ 3. The decades-long relationship between UPS and the Union is governed by a collective bargaining agreement called the National Master United Parcel Service Agreement ("NMA"). Compl. ¶ 6; Dkt 1-1. The NMA provides a mandatory grievance and arbitration procedure and requires arbitration for "[a]ll grievances and/or questions of interpretation" concerning "provisions of [the NMA]." *See* Dkt. 1-1 (Art. 8, §§ 1, 4,

6). The NMA expressly empowers arbitrators to undo any agreements that conflict with the collective bargaining agreement. *Id.* (Art. 6, § 1).

### A.    The Driver Choice Program.

UPS faces a pressing need to reduce the number of drivers it employs because of market conditions and other factors, including significant changes to its delivery network and changes in its relationship with its largest customer: Amazon. Clayton Decl., ¶ 4. UPS's average daily package volume in the U.S. declined year-over-year by 1.6 million pieces or 8.6% in 2025. *Id.* More than half of that decline was due to reductions in the package volume UPS handles for Amazon, and UPS expects to reduce its Amazon volume by a similar amount in 2026. *Id.*; Dkt. 1-3 at 1. In addition, UPS at the end of 2025 signed a new contract with the United States Postal Service ("USPS") through which the USPS would—as the terms of the NMA permit—handle some final-mile delivery of UPS's Ground Saver packages. Clayton Decl., ¶ 5; Dkt. 1-3 at 1. UPS began to ramp up its use of the USPS for Ground Saver final-mile delivery in mid-January 2026 and plans to continue in the coming months. Clayton Decl., ¶ 5.

In connection with these changes, UPS anticipates needing fewer drivers in 2026 and plans to reduce its driver workforce through attrition and involuntary layoffs. *Id.* ¶ 6. UPS developed a nationwide voluntary separation program called the Driver Choice Program ("DCP") that would reduce the need for involuntary layoffs. *Id.*; Dkt. 1-3 at 1. UPS plans to implement this program across the United States, giving drivers the opportunity to voluntarily resign in exchange for a severance payment on top of their previously earned healthcare and retirement benefits. Clayton Decl., ¶ 6. This is the second voluntary separation program UPS has offered drivers. *Id.* The first program, discussed below, was offered last year. *Id.* ¶ 13.

UPS planned to send eligible employees information about the DCP on February 11, 2026, with an election window remaining open from February 13, 2026 until March 12, 2026. Compl.

¶ 18; Dkt. 1-3 at 1.  UPS has begun preparing for the DCP roll-out to approximately 105,000 UPS drivers across the United States, including generating program material to distribute to its eligible employees and an online portal for applications.  Clayton Decl., ¶ 6; Dkts. 1-3, 1-4, 1-5.

To participate in the DCP, eligible UPS drivers must submit an application during the election window.  *Id*. ¶ 14; Dkt. 1-5 at 1-2.  If UPS approves a driver's application, the driver is notified within two weeks of the election window closing (i.e., by March 27, 2026) and is provided a Separation Agreement via an online portal.  *Id*.  UPS plans to begin voluntary separations on or about April 26, 2026.  *Id*.

**B.    The Dispute between UPS and the Union.**

UPS first notified the Union it was considering a second voluntary separation program for drivers on January 8, 2026, in an in-person meeting between Teamsters International General President Sean O'Brien and UPS's President of Global Labor Relations Daniel Bordoni.  Clayton Decl., ¶ 7.  The next day, on January 9, 2026, Mr. Bordoni sent Mr. O'Brien a copy of the draft materials detailing the proposed terms of the DCP.  Compl. ¶ 18; Clayton Decl., Ex. A.  In the transmittal email, Mr. Bordoni offered to bargain over the program, noting that the Company was open to the Union's input and would prefer to develop something jointly.  *Id.*  Mr. Bordoni informed Mr. O'Brien that the Company wanted to announce the DCP to employees on February 11, 2026.  *Id*.  The Union did not respond to this invitation to bargain over the DCP, which was the same response the Union gave in connection to the driver separation program the Company offered in 2025.  Clayton Decl., ¶¶ 8, 13.  Just over three thousand drivers of the approximately one-hundred and fifteen thousand eligible drivers at the time volunteered and participated in the 2025 program—called the Driver Voluntary Separation Program ("DVSP").  *Id*. ¶ 13.  The Union declined to bargain about the DVSP and later took the position that it violated the NMA.  *Id*.  The Union has taken the same position with respect to the DCP.  Compl. ¶ 29; Dkt. 1-10.

On January 27, 2026, Mr. O'Brien sent Mr. Bordoni a letter stating the Union's position that the proposed program violates the NMA, although the Union neither identified any specific NMA provision(s) it believed would be violated nor filed a grievance concerning the same. Compl. ¶ 25; Dkt. 1-6.  The letter requested extensive information, which the Union said it needed in connection with its contract violation claims.  *Id*.  UPS responded by letter on January 30, explained that the DCP does not violate the NMA, provided additional information regarding the DCP, and reminded the Union that it still planned to send the DCP materials to employees on February 11.  Dkt. 1-7.  UPS also offered to meet at the Union's convenience to discuss its concerns related to the DCP.  *Id*.  On February 3, Mr. O'Brien responded, again stating the Union believed the DCP violated the NMA, asked for information regarding those alleged violations, and requested that the Company delay implementation of the DCP.  Dkt. 1-8.  The Union did not take UPS up on its offer to meet.  On February 6, UPS responded, again disagreeing with the Union's position of an NMA violation and explaining that UPS intended to move forward with implementing the DCP on February 11.  Dkt. 1-9.

On February 6, 2026, just days before the Company's stated DCP implementation date, the Union filed a grievance, alleging that the DCP violated several provisions of the NMA, as well as unspecified local supplemental agreements/riders.  Dkt. 1-10.  UPS is processing the Union's grievance consistent with the NMA grievance and arbitration procedures, and sent a written response to the Union's grievance on February 12, 2026.  Clayton Decl., ¶ 12, Ex. M.  Notably, there is no allegation that UPS is refusing to participate in the NMA grievance-arbitration process. *See id.*; *see also* Compl. ¶ 29.  If the parties' dispute is not resolved in the grievance procedure, the Union has the right to demand arbitration under the NMA.  *See* Dkt. 1-1 (Art. 8).

Nothing in the NMA prevents management action or implementation of the DCP pending

arbitration.  *See* Dkt. 1-1.  The selected arbitrator will have jurisdiction to determine if the DCP

violates the NMA and, if necessary, to fashion an appropriate remedy.  *Id*.

> ### C.    This Litigation Is the Teamsters' Latest Attempt to Conscript the Courts in a Labor Dispute with UPS.

This is not the first time that the Teamsters have improperly sought judicial intervention to

stop UPS from implementing a voluntary separation program.  On August 15, 2025, Teamsters

Local Union 710 filed a complaint and motion for a "reverse *Boys Markets* injunction" in the

Northern District of Illinois in connection with the DVSP.  *See Teamsters Loc. 710 v. United*

*Parcel Service, Inc.* ("*Teamsters*"), No. 1:25-cv-9775 (N.D. Ill. Aug. 15, 2025) (ECF No. 1).  In

that case, Teamsters Local 710 argued that it would suffer irreparable injury if UPS implemented

the DVSP before an arbitrator decides its permissibility under the parties' collective bargaining

agreement.  Solomont Decl., Ex. B (*Teamsters*, ECF No. 4-3, at 9-12).  The court denied the

requested reverse *Boys Markets* injunction from the bench.  *Id.*, Ex. C (ECF Nos. 25-26).

Like the Union here, Teamsters Local 710 argued that an arbitrator would have no power

to fashion a remedy for any employees who elected to resign under the program. *Id.*; Ex. D (ECF

No. 5-1, at 2).  Expressly rejecting that argument, the court concluded that the collective bargaining

agreement provides "that any separate agreement entered into by [UPS] and any individual

member of the Union is null and void to the extent that it conflicts with the terms of the CBA."

Ex. C.[1]  The court went on to explain that "the arbitrator will have the power and authority to void

any and all buyout agreements that are signed by Union members, in the event Plaintiff succeeds

on the merits at arbitration."  *Id*.  Local 710 therefore had not shown that arbitration would be

meaningless.  *Id*.  On September 28, 2025, Teamsters Local 710 voluntarily dismissed the action.

---

[1] While Local 710 has a standalone CBA, the quoted language is nearly identical.  *See* Solomont Decl., Ex. E (Local 710 CBA).

*Teamsters*, No. 1:25-cv-9775, ECF No. 27.

## ARGUMENT

To grant a *Boys Markets* injunction, a court must first determine that it has "jurisdiction" despite the broad "interdictory provisions of the Norris-LaGuardia Act." *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988). A union seeking a reverse *Boys Markets* injunction "must first show that its grievance is arbitrable," "must demonstrate the necessity of an injunction to preserve the arbitration," and "must show that irreparable harm and imbalanced hardships would result without the injunction." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. Union No. 251 v. Almac's, Inc.*, 894 F.2d 464, 465 (1st Cir. 1990) (reversing trial court's grant of a reverse *Boys Markets* injunction where the union failed to identify evidence of irreparable harm). The injunction must "meet all the usual criteria for injunctive relief, including irreparable injury, likelihood of success on the merits, balancing of the equities, and consideration of the public interest." *Verizon New England*, 651 F.3d at 184.

Although the Union's grievance is arbitrable, the Motion fails every other requirement. As the Northern District of Illinois recently held in the *Teamsters* case, this fact pattern does not satisfy the reverse *Boys Markets* exception given the arbitrator's authority under the parties' collective bargaining agreement. Nor has the Union satisfied the traditional factors for preliminary injunctive relief: (i) it cannot show a likelihood of success on the merits, due both to the jurisdictional defects and the Union's failure to identify any controlling collective bargaining agreement provision that prohibits UPS from implementing the DCP; (ii) it cannot show any irreparable injury because an arbitrator could easily remedy any alleged harm through monetary damages, reinstatement, or voiding voluntary separation of UPS employees if warranted under the collective bargaining agreement; (iii) the balance of hardships strongly supports denying this injunction because UPS

and its employees will sustain substantial harm while the Union has not demonstrated any purported harm which could not be remedied by arbitration; and (iv) the Union provides no legal or factual basis for its assertion that the public interest supports this injunction, which is unsurprising given the clear congressional policy in favor of resolving labor disputes through collective bargaining and grievance-arbitration procedures rather than the federal courts.

### A.    The Court Lacks Jurisdiction to Issue the Union's Requested Injunction Under the Norris-LaGuardia Act.

As a threshold matter, the Court should deny the Motion because it lacks jurisdiction to enjoin UPS under the Norris-LaGuardia Act.  The Union identifies no support for its assertion that implementing the DCP would render arbitration meaningless absent judicial intervention, as required to satisfy the narrow reverse *Boys Markets* exception.  Rather, the parties agree they have a binding and well-functioning grievance and arbitration process.  Because the Union cannot show that process would be rendered meaningless, the Motion should be denied.

### 1.    The Reverse *Boys Markets* Exception to the Norris-LaGuardia Act Applies Only When Arbitration Would Otherwise Be Meaningless.

Congress enacted the Norris-LaGuardia Act to "limit severely the power of the federal courts to issue injunctions 'in any case involving or growing out of a labor dispute.'"  *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 251 (1970).  The Act provides that "[n]o court of the United States … shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the" Act.  29 U.S.C. § 101; *see* 29 U.S.C. §§ 104, 107.  The Norris-LaGuardia Act creates a "strong prohibition" against injunctive relief "addressed to arbitrable matters." *Procter & Gamble*, 864 F.2d at 929.

In *Boys Markets*, the Supreme Court created a very limited exception to the Norris-LaGuardia Act's general prohibition against injunctive relief.  The traditional *Boys Markets* fact

pattern involves an *employer* obtaining an injunction to compel the union to stop striking or engaging in a work stoppage over an arbitrable grievance. *Id*. The *Boys Markets* Court reasoned that the *quid pro quo* between employer and union is the employer's agreement to arbitrate certain decisions in exchange for the union's promise not to strike. *Id*. A traditional *Boys Markets* injunction holds a union to its promise. *See also, e.g.*, *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 413 (1976) (reaffirming congressional policy against labor injunctions).

As the name suggests, a reverse *Boys Markets* injunction is the flipside of the injunction that the Supreme Court authorized in that case. *See Verizon New England*, 651 F.3d at 184 n.4. A typical reverse *Boys Markets* injunction involves a *union* seeking to enjoin an employer policy or decision, such as a plant closure or sale of a business, pending the arbitration of a grievance. *Id*. But given the strong policy of the Norris-LaGuardia Act, unions may obtain such injunctive relief under the reverse *Boys Markets* exception only if, "without the injunction, arbitration would be meaningless and irreparable harm will result." *Almac's*, 894 F.2d at 466; *accord Procter & Gamble*, 864 F.2d at 930.

Courts have found only a few limited circumstances that justify a reverse *Boys Markets* injunction. Such circumstances include plant relocations, sales, or shutdowns—where it is infeasible to rewind the employer's actions—or scenarios where the employer's actions give rise to serious safety concerns. *See Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 419 F. Supp. 3d 127, 136-37 (D.D.C. 2019) ("commentators have noted that 'very few employer actions would frustrate arbitration in the sense of rendering it a nullity'") (citation omitted); *Procter & Gamble*, 864 F.2d at 929 ("Because the exception cannot be allowed to engulf the rule, it must be tightly confined"); *Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.*, 1988 WL 105625, at *1 (D. Mass. Oct. 3, 1988) (only "compelling factual situations"

warrant labor injunctions such as "sale of the defendant's operation and distribution of its assets"), *aff'd*, 864 F.2d 927 (1st Cir. 1988). In short, the case must present "a Humpty Dumpty situation" in which the arbitrator's best efforts cannot repair the main damage. *Almac's*, 894 F.2d at 466. As demonstrated below, the Union cannot make this showing.

### 2. The Union Has Failed to Establish That Arbitration Would be Rendered Meaningless if UPS Implements the DCP.

The Union does not—and cannot—carry its burden of showing that UPS's decision to implement the DCP would render the arbitration process meaningless or threaten the integrity of the arbitration process.[2] Notably, the Union fails to identify *any case* where a court granted a reverse *Boys Markets* injunction to block employer action similar to the DCP. To the contrary, in the only two decisions to address similar voluntary severance programs—one involving UPS mere months ago—courts declined to grant a reverse *Boys Markets* injunction. *See Teamsters* (Solomont Decl., Ex. C); *see also Loc. Union 15, Int'l Bhd of Elec. Workers v. Exelon Corp.*, 191 F. Supp. 2d 987, 994 (N.D. Ill. 2001).

The crux of the Union's argument is that arbitration would be rendered meaningless if UPS and the employees who voluntarily apply for the DCP sign the separation agreements because such contracts allegedly "cannot be undone" because "an arbitrator appointed under the NMA [supposedly] has no authority to nullify an executed Release." Mem. at 13-14. This assertion is refuted by the express terms of the NMA and Supreme Court precedent.

Article 8, Section 6 of the NMA provides an arbitrator broad authority to consider the Union's DCP grievance and fashion an appropriate remedy: "The arbitrator shall have the authority to apply the provisions of [the NMA] and to render a decision on any grievance coming

---

[2] The parties do not dispute that the Union's grievance over the DCP is covered by arbitration and is a colorable grievance, though one that UPS believes will ultimately fail. *Verizon New England*, 651 F.3d at 184.

before them." Dkt. 1-1 (Art. 8, § 6).  In addition, the NMA expressly empowers an arbitrator to undo any separate agreement between UPS and an individual Union-represented employee that conflicts with the terms of the collective bargaining agreement:

> Except as may be otherwise provided in this Agreement, [UPS] agrees not to enter into or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document … which in any way conflicts with the provisions of this Agreement. **Any such agreement or document shall be null and void.**

Dkt. 1-1 (Art. 6, § 1) (emphasis added).  Thus, if the arbitrator ultimately finds that implementation of the DCP "conflicts with" the collective bargaining agreement, the arbitrator unquestionably has the authority to fashion a remedy that includes nullifying or voiding any separation agreements. And any employee who applies for and is accepted to participate in the DCP is indisputably covered by this NMA provision.  Despite quoting this provision in its background section (Mem. at 3), the Union attempts no argument or explanation as to why it would not apply here.

In addition to the NMA's express language, Supreme Court precedent makes clear that a labor contract overrides individual employment contracts to the extent they conflict.  In *J.I. Case Co. v. NLRB*, 321 U.S. 332 (1944), the Supreme Court observed that while individual employees may sign separate agreements, such "individual contract[s] cannot be effective as a waiver of any benefit to which the employee otherwise would be entitled under" a collective bargaining agreement.  *Id.* at 338-39.  Thus, a labor contract "supersedes an individual employment contract to the extent that they are inconsistent."  *Loewen Grp. Int'l, Inc. v. Haberichter*, 65 F.3d 1417, 1423 (7th Cir. 1995).  Again, the Union offers no explanation.

Yet these points explain why, just last August, the Northern District of Illinois denied Teamsters Local No. 710's motion for a reverse *Boys Markets* preliminary injunction against UPS based on the same theories of harm.  *Teamsters* (Solomont Decl., Ex. C).  That case concerned the DVSP—a voluntary driver separation program that the Union concedes is "a similar program to

11

the DCP." Mem. at 19. The Union discusses the DVSP and resulting grievances at length (which

the Union says raise "the same legal questions" as the grievance underlying this case, Mem. at 19),

but astonishingly fails to mention that earlier unsuccessful attempt to obtain a preliminary

injunction based on the same arguments the Union raises here. In *Teamsters*, the court found that

"Plaintiff ha[d] not met its burden of showing irreparable injury, as required under *Boys Markets,

Inc.* and its progeny." *Teamsters* (Solomont Decl., Ex. C). While "Plaintiff ha[d] provided

evidence of the possibility of some ongoing harm, that injury is not so irreparable that an arbitration

decision in the union's favor would be but an empty victory." *Id.* (quoting *Bhd. of Locomotive

Eng'rs v. Missouri-Kansas-Texas R.R. Co.*, 363 U.S. 528, 534 (1960)).

In so holding, the court expressly rejected the Union's argument here that an arbitrator

cannot undo a separation agreement. To the contrary, "the collective bargaining agreement

provides that any separate agreement" with "any individual member of the Union is null and void

to the extent that it conflicts with the terms of the CBA." *Id.* The same language that barred a

reverse *Boys Markets* injunction in that case likewise does here.[3]

Another decision rejecting the Union's argument is *Exelon*. The court there held that an

employer's offer of a severance package in exchange for a voluntary resignation did not give rise

to the type of harm that would render arbitration meaningless. 191 F. Supp. 2d at 994. The court

rejected a union's argument that an arbitration may not have the "power to set aside the individual

severance agreements," holding that "if the arbitrator indeed found in favor of the Union on the

---

[3] The motion also observes that the proposed DCP agreements include releases and a seven-day
grace period for the employee to revoke the agreement. *See* Mem. at 6, 13-14. But the agreements
under the DVSP included materially identical provisions, Dkt. 1-4; *cf.* Solomont Decl., Ex. N
(*Teamsters* ECF No. 22-3), and, again, the Union does not dispute that Teamsters' requested
injunction in that case was denied given the arbitrator's ability to nullify those agreements if held
to conflict with the collective bargaining agreement. *See supra*.

merits, it would have the authority to rescind the severance agreements, thereby remedying any injuries suffered by the affected employees," including by "reinstat[ing] [any] wrongfully laid-off employees." *Id*. The same reasoning refutes any claim of irreparable harm based on the DCP.

Courts have repeatedly denied reverse *Boys Markets* injunctions in a wide range of other cases, too, including those involving *involuntary* restructuring of workforces or shifts. *Commc'ns Workers of Am., AFL-CIO v. Verizon New York Inc.*, 2002 WL 31496221, at *5-6 (S.D.N.Y. Nov. 8, 2002) (declining to enjoin an employer's decision to lay off almost 4,000 union employees; emphasizing that under the reverse *Boys Markets* framework "the focus of the inquiry is whether the arbitration will become a futility, not what the results of the arbitration's potential lack of timeliness will have on the world outside that of the labor dispute"); *Columbia Loc., Am. Postal Workers Union, AFL-CIO v. Bolger*, 621 F.2d 615, 616 (4th Cir. 1980) (reversing district court's grant of a reverse *Boys Markets* injunction prohibiting the U.S. Postal Service from eliminating certain shifts, observing that difficulty in fashioning relief over interim harm if the union prevails "does not make the process a hallow formality"). These cases involved the same potential temporary harms of lost seniority or lost benefits that the Union invokes here (Mem. at 13), but the arbitrator's ability to void *involuntary* layoffs and reinstate the employees clearly showed arbitration would not be meaningless. That is at least as true for the *voluntary* DCP here.

Indeed, courts in this Circuit readily deny reverse *Boys Markets* injunctions despite alleged harms much more severe than those alleged here. *See, e.g.*, *Dist. Loc. Union No. 592, United Foods & Com. Workers Intern Union, AFL-CIO v. Catelli-Habitant, Inc.*, 1989 WL 201079, at *2 (D. Mass. Apr. 25, 1989) (denying union's request for a reverse *Boys Markets* injunction to prevent the employer from selling the company's assets); *Union de Periodistas, Artes Graficas y Ramas Anexas v. Caribbean Int'l News Corp.*, 2009 WL 10720190, at *3 (D.P.R. Sept. 4, 2009) (denying

union's request for a reverse *Boys Markets* temporary restraining order and injunction prohibiting the employer from subcontracting certain work to the detriment of bargaining unit members considering "critical absence of any allegation that [the employer] is selling and/or closing its distribution center"). Without facts showing that arbitration would become meaningless, "there is nothing that would justify ignoring the limitations imposed upon [courts] by the Norris-LaGuardia Act." *Proctor & Gamble*, 1988 WL 105625, at *1.

That is exactly why the First Circuit reversed the grant of a reverse *Boys Markets* injunction in *Almac's*, 894 F.2d at 466-67. The district court had enjoined the employer from laying off employees in anticipation of a sale of the employer's facility. *Id.* at 466. The First Circuit held that those layoffs did not pose irreparable harm to support a reverse *Boys Markets* injunction because "terminations can be remedied through reinstatement" and backpay. *Id.* That reasoning similarly refutes the Union's assertion that an arbitrator could not make whole employees who *volunteer* to separate from employment in the DCP.

Nor, in any event, is an arbitral process "rendered 'meaningless' by the inability of an arbitrator to completely restore the status quo ante or by the existence of some interim damage that is irremediable." *Niagara Hooker Emps. Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1378 (2d Cir. 1991); *accord Procter & Gamble*, 864 F.2d at 931 (rejecting union's claim that its arbitral victory "would necessarily be thwarted by changed circumstances" given the arbitrator's ability to restore the working conditions to the way "that existed beforehand," as "such relief, though not as satisfactory as freezing the status quo, would be far from meaningless"). Indeed, another court in this District has recognized that irreparable injury exists only where "the company is unwilling to submit the dispute to arbitration" or there is a "compelling factual situation" such as "the sale of the defendant's operation and distribution of its assets" which would "effectively make arbitration

a nullity." *Proctor & Gamble*, 1988 WL 105625, at *1.  Because the Union cannot present a remotely comparable situation, the Court lacks jurisdiction to grant the Union's request for a reverse *Boys Markets* injunction.[4]

**B.**    **The Union Has Failed to Establish the Traditional Equitable Requirements for a Preliminary Injunction.**

In addition to the jurisdictional defects, the Court should deny the Union's Motion under traditional principles of equity: (i) the Union is unlikely to succeed on the merits; (ii) it cannot, as a matter of law, identify an irreparable injury given that an arbitrator could easily remedy any alleged harm; (iii) the balance of hardships strongly supports denying this injunction because the harm to UPS greatly outweighs any purported harm to the Union; and (iv) the Union provides no legal or factual basis for its assertion that the public interest supports this injunction.

**1.**    **The Union Is Unlikely to Succeed on the Merits.**

The Union is unlikely to succeed on the merits of its underlying grievance.  Nothing in the NMA expressly addresses voluntary separation incentive programs, much less prohibits them. Likely recognizing that fact, the Union alleges the DCP violates various collective bargaining agreement provisions relating to other topics, including Union stewards (Art. 4), jobs creation (Art. 22, Sec. 3), and involuntary layoff procedures.  Mem. at 16-17; Dkt. 1-10.

None of these theories help the Union satisfy this factor.  For example, the Union does not

---

[4] The Union identifies no reverse *Boys Market* injunction on facts remotely similar to those here. It cites *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir. 1981), and *Lever Brothers Co. v. Int'l Chemical Workers Union*, 554 F.2d 115, 122 (4th Cir. 1976), but they involved impending sales of employer facilities and thus are distinguishable for the reason the First Circuit identified in *Almac's*, 894 F.2d at 466-67.  Also off point is *Nat'l Ass'n of Gov't Emps., Inc. v. Nat'l Emergency Med. Servs. Ass'n, Inc.*, 969 F. Supp. 2d 59 (D. Mass. 2013), which involved a union enjoining another union for breach of an anti-raiding provision. *Id.* at 71.  The Union also cites *Aluminum Workers International Union v. Consolidated Aluminum Corp.*, 696 F.2d 437 (6th Cir. 1982), but it strongly supports UPS: it vacated a reverse *Boys Markets* injunction based on "the consequences of temporary unemployment" because an arbitrator could make employees whole for lost pay, health benefits, and other harms.  *Id.* at 444.

explain how the DCP would exclude Union representatives from being present at a meeting between UPS and an employee "concerning grievances" in violation of NMA Article 4. The Union identifies no basis on which an arbitrator could hold that UPS is failing to meet its Article 22 obligations with respect to creation of full-time jobs. As to the Union's claims regarding layoff procedures, the Union references the New England Supplemental Agreement ("NE Supplement"), but does not identify any specific provision or language it believes the DCP would violate.[5] An arbitrator is unlikely to find a violation of the NE Supplement, which sets forth procedures that apply only to *involuntary* layoffs—not voluntary separations such as the DCP—and the Union does not identify any language, bargaining history, or other evidence that would suggest involuntary layoffs were intended to be the exclusive method for workforce reduction or that would otherwise prohibit UPS from implementing a voluntary separation program. Additionally, Article 6, Section 1 has never been interpreted to prohibit all individual agreements between UPS and its employees, and arbitrators have permitted individual agreements in the past.[6]

Indeed, the Motion does not even attempt to argue that it is likely to succeed on these or other of its breach of contract allegations: it just lists them. Mem. at 16-17. Doing so is not enough to show that the Union's position is "sufficiently sound" to warrant injunctive relief. *Int'l Bhd. of Elec. Workers, Loc. 2327, AFL-CIO v. Consol. Commc'ns of N. New England Co.*, 2019 WL

---

[5] While the Union appears to claim the DCP also violates other local/regional supplemental agreements, the Union has not attached or specifically referenced any agreements other than the NE Supplement.

[6] *See, e.g.*, Ex. F *Teamsters Local 804 and UPS*, AAA Case No. 18-300-667-12 (Wittenberg, arb.; 2014) (UPS did not violate NMA Art. 6 by entering into agreements with individual employees to waive their right to work a full eight hours and receive eight hours pay); Ex. G *Teamsters Local 413 and UPS*, AAA Case No. 01-16-0005-4593 (Glendon, arb.; 2017) (UPS did not violate NMA by entering into agreements with individual employees for a seasonal bonus program); Ex. H *Teamsters Local 162 and UPS*, AAA Case No. 01-16-0002-7387 (Axon, arb.; 2017) (UPS did not violate NMA by implementing an extra-contractual incentive program for employees); Ex. I *Teamsters Local 623 and UPS*, AAA Case No. 01-18-004-4376 (Brogan, arb.; 2019) (same).

7546601, at *2 (D. Me. Aug. 23, 2019) (looking to terms of agreement to decide whether arbitrator could find a violation); *Nat'l Union of Healthcare Workers v. Children's Hosp. & Rsch. Ctr. at Oakland*, 2025 WL 1785317, at *5 (N.D. Cal. June 27, 2025) (holding union "failed to clear" sufficiently sound requirement because the CBA conflicted with union's arguments).  The Union's choice to simply list its allegations—which are refuted by the collective bargaining agreement—cannot carry its burden as to the first element, and is an independent reason to deny the Motion.

### 2.     The Union Cannot Identify Any Irreparable Injury.

Plaintiffs seeking a preliminary injunction must show a likelihood—not a mere possibility—of irreparable injury in the absence of an injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22-23 (2008).  While the Union claims that it would suffer irreparable harm, this assertion presumes that an arbitrator could not rescind the individual separation agreements entered by drivers who choose to participate in the DCP.  Mem. at 16.  For the reasons discussed *supra* pp. 10-13, that assumption is belied by the express terms of the NMA and legal precedent.

As an initial matter, the Union never argues that *it* will be irreparably harmed by the DCP. It does not argue that any voluntary separations will sufficiently erode its bargaining strength, for instance, nor identify any other harm—let alone irreparable harm—to the Union.  That failure to make any such argument was for good reason: courts consistently reject such speculative harm-to-the-union arguments.  *See, e.g.*, *Teamsters* (Ex. C); *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) (rejecting "lost confidence" in the union argument as speculative and because "accepting the plaintiff's argument would open the door to preliminary injunctive relief in a substantial majority of cases."); *Graphic Comm. Conf.-Int'l Bhd. of Teamsters Loc. 404M v. Bakersfield Californian*, 541 F. Supp. 2d 1117, 1126 (E.D. Cal. 2008) (explaining "loss of union representation for a short period of time does not qualify" as irreparable harm).

Instead, the Union focuses on alleged harms to certain employees *if* they volunteer to participate in the DCP and *if* the arbitrator is unable to nullify their separation agreement.  As discussed at length above, the NMA explicitly provides an arbitrator authority to void any DCP separation agreements.  *Supra* pp. 10-11.  The Union likewise offers no argument as to why the other alleged harms it cites are irreparable.  *See* Mem. at 13-15 (discussing potential lost seniority rights and pension accruals, and claiming without evidence that employees "may" have participated in health and welfare plans).  This likely is due to the fact that the harms alleged routinely are remedied by arbitrators through reinstatement awards, including under the collective bargaining agreement.  The law further recognizes that any such harm is compensable, not irreparable.  *See, e.g.*, *Almac's*, 894 F.2d at 466-67; *Consolidated Aluminum*, 696 F.2d at 444.

The Union also fails to account for the UPS drivers who would resign or retire between now and completion of the arbitration irrespective of the DCP, as well as reductions to UPS's driver workforce through attrition and *involuntary layoffs*.  *See* Clayton Decl. ¶¶ 6, 15; *see* Mem. at 18 (recognizing UPS could "utilize the layoff/reduction-in-force procedures").  Contrary to the Union's speculation, implementation of the DCP during the pendency of arbitration will not cause the Union—or employees—any irreparable harm.

### 3.    The Balance of Hardships Warrants Denial of The Union's Motion.

Injunctive relief also is improper because the Union has not met its burden to show that it will suffer more from the denial of an injunction than UPS will from its issuance.  As discussed above, the only potential harm asserted by the Union is the possibility that some employees may voluntarily resign, which the Union assumes would be "irrevocable" by an arbitrator.  Mem. at 18.  But the Union's assumption is baseless—and refuted by the NMA.  Because an arbitrator may reinstate employees with backpay and make-whole relief (including reinstating seniority and benefits, and compensating any other injuries), the Union identifies no harm to "balance" under

18

this factor at all.  *See Consolidated Aluminum*, 696 F.2d at 444.

In arguing that UPS will suffer no harm from delay of the DCP, moreover, the Union ignores that the nationwide program will *benefit* UPS by minimizing business disruptions and aligning UPS's driver workforce with its new delivery volume levels resulting from UPS's Amazon glide-down and recent agreement with the USPS.  Clayton Decl. ¶¶ 4-6, 15.  Delaying those benefits of course represents harm to UPS.  Further, the DCP's implementation schedule, with an announcement in the first quarter of 2026 and voluntary employee separations beginning in the second quarter of 2026, is designed to provide UPS greater clarity and alignment as to its staffing levels and cost structure in advance of the summer vacation season and well in advance of the holiday-driven peak season, for which planning has already begun.  *Id*.

Rather than dispute UPS's need to reduce the size of its workforce, the Union remarkably argues that UPS should implement *involuntary layoffs* if needed.  Mem. at 18.  The Union never explains how layoffs alone would be better for employees (or anyone) than also having the option for voluntary separations in exchange for substantial consideration.  If an employee has the option to accept $150,000 in exchange for a voluntary separation, she will certainly be better off than an employee who simply is involuntarily laid off.  UPS and its workforce as a whole also benefit if employees who want to resign in connection with the DCP have the opportunity to do so, creating staffing certainty and opportunities for employees who remain—including the opportunity to potentially avoid a layoff entirely.  The Union never argues otherwise—let alone provides any comparison of harms between these two scenarios.

The Union also ignores employees who will elect to leave UPS during the pendency of any injunction, who will have no opportunity to enjoy the $150,000 UPS seeks to offer them.  In addition, UPS and drivers who are considering retiring or otherwise voluntarily leaving their

employment may lose the opportunity to do so with the financial incentive provided by the DCP altogether.  By the time an arbitral award is issued, the DCP may no longer be practical or relevant for UPS given the passage of time and/or staffing reductions through other means.  These harms outweigh any purported harm to the Union—especially when that purported harm may be undone by an arbitrator.[7]

### 4.    The Public Interest Supports Denying the Union's Motion.

The Union also must establish that its injunction comports with public policy.  *Verizon New England*, 651 F.3d at 184.  For a reverse *Boys Markets* injunction, "[i]n an arena where collective bargaining is the preferred method of dispute resolution, the nation's labor policy counsels that district courts be chary about intruding into the field." *Procter & Gamble*, 864 F.2d at 929.  Indeed, "it is a fundamental principle of industrial relations in the United States that labor disputes are settled through voluntary arbitration rather than labor/management strife." *Otis Elevator Co. v. Int'l Union of Elevator Constructors, Loc. 4*, 408 F.3d 1, 7 (1st Cir. 2005).  And "congressional policy [strongly militates] toward settlement of labor disputes by arbitration," not judicial intervention.  *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 458 (1957).

The Union fails to meaningfully address this prong of injunctive relief, let alone provide any public policy supporting "intruding" into a labor dispute subject to mandatory arbitration.  So the Union fails to carry its burden to establish that public policy supports an injunction.

## <u>CONCLUSION</u>

For these reasons, UPS respectfully requests that the Court deny the Union's request for a temporary restraining order and preliminary injunction.

---

[7] And while the Union asserts (without support) that the DCP violates the collective bargaining agreement, the Union has identified no provision in the collective bargaining agreement where UPS supposedly "agreed to" delay implementation of a voluntary separation program pending the grievance and arbitration process.  Mem. at 17-18.  No such provision exists.

Dated: February 13, 2026

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Charles Solomont*

**Charles Solomont**
Bar No. 557190
One Federal Street
Boston, Massachusetts 02110-1726
P: (617) 341-7700
E: carl.solomont@morganlewis.com

**Michael E. Kenneally**
*pro hac vice*
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
P: (202) 739-3000
E: michael.kenneally@morganlewis.com

**James D. Nelson**
*pro hac vice*
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
P: (202) 739-3000
E: james.nelson@morganlewis.com

*Attorneys for Defendant United Parcel Service, Inc.*

21

## CERTIFICATE OF SERVICE

I certify that on February 13, 2026, a true and correct copy of the foregoing document has been served on all counsel of record via the Court's e-filing system.

*/s/ Charles Solomont*
Charles Solomont