# Exhibit G

**AMERICAN ARBITRATION ASSOCIATION**

UNITED PARCEL SERVICE, INC.

   -and-                                                                                        Case No. 01-16-0005-4593

INTERNATIONAL BROTHERHOOD                         Grievance No. N-16-97
OF TEAMSTERS, LOCAL 413

---

**SUBJECT**

Non-negotiated incentive payments for newly hired, non-seniority, part-time sort and pre-load employees.

**ISSUE**

Did the Company violate Article 6 Section 1 of the National Master Agreement and/or Article 19 Section 10 of the Central Region Supplement by offering and making incentive payments in 2015 and 2016 to newly hired, non-seniority, part-time sort and preload employees in the Columbus, Ohio area?

**CHRONOLOGY**

Grievances filed: July, September and November 2015, June 2016
National Grievance Committee Deadlock: September 15, 2016
Arbitration hearing: June 23, 2017
Briefs received: August 11, 2017
Award issued: September 8, 2017

**APPEARANCES**

For the Company: Tony C. Coleman, Attorney
For the Union: Clement L. Tsao, Attorney

**SUMMARY OF FINDINGS**

The Company did not violate NMA Article 6 or Article 19 Section 10 of the Central Region Supplement either by unilaterally offering or paying retention incentive payments to newly hired, non-seniority, part-time sort and preload employees in the Columbus area or having them sign Retention Incentive Guidelines describing such incentives.

**EVIDENCE AND ARGUMENT**

In July 2015 the Company offered "retention incentives" to newly hired, non-seniority, part-time sort and preload employees at certain facilities in the Columbus, Ohio area. They were described on a document entitled Retention Incentive Guidelines that employees apparently were asked to sign upon hiring (neither party presented evidence that any or all of them actually signed it). As stated in those guidelines, employees who worked entire scheduled weeks including Saturday and Sunday "operational work days" were to be paid $100 (for night sort employees) or $75 (for day, twilight, preload and gateway employees) per week in addition to contractual hourly wages plus a "$400.00 additional one time retention incentive" for "6 months of employment beginning July 20, 2015," which "may extend to June 2016 for employees hired in December 2015."

The incentives were not negotiated with the Union or offered or paid to part-time employees with seniority, which is attained, as provided in Article 1 Section 1 of the Central Region Supplemental Agreement, after thirty days' work in ninety consecutive days; until then employment is "on a trial basis." Seniority does not accrue for time worked by seasonal employees November 1 through Friday of the second full week of January unless they are retained or recalled within sixty days after Friday in the second full week of January and again work thirty-in-ninety days. Part-time employees with seniority receive some contractual benefits; newly hired, non-seniority part-time employees do not.

In a grievance filed July 31, 2015 the Union charged that implementing the "Incentive Program without approval from Teamster Local 413 or any affected employee" violated "Article 6, NMA and Article 19 of the CRT" and asked "that the Incentive Program cease immediately." The relevant parts of those two articles, Article 6 Section 1 and Article 19 Section 10, read as follows:

> **Section 1. Extra Contract Agreements**
>
> Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void. Any such agreement or document may not be placed in an employee's file or used by the Employer as a basis for discipline or

used in connection with any disciplinary proceeding, nor may any such agreement or document nor the contents thereof be divulged to any person or entity.

**Section 10**

There will be no newly implemented incentive plans or bonus plans unless approved by the affected employees and the Union. Current plans will remain in effect unless grieved by the majority of the employees involved and approved by the Joint Area Committee.
(1) Individual grievances must be completed by each employee requesting the plan to be terminated and the grievances must be submitted to the local union within three weeks of their being written.
(2) Once a grievance on this subject has been submitted to the local union, management is not to attempt to resolve the grievance with the grievant without a representative of the Union present.
(3) If a majority of the package car drivers in a center write grievances within a three week period, the local union shall advise the Employer within one week and submit the issue to the JAC for approval.
(4) The local union shall have the right to attend any meetings on this subject conducted by the Employer from the time the grievances are submitted to the JAC until they are heard.

Also relevant is Article 22 Section 5 of the NMA, which reads as follows:

**Section 5. Wages**
(a) Part-time Employees.
All part-time employees who have attained seniority as of August 1, 2013 will receive the following general wage increases for each contract year. In the first three years of the contract, the increase will be effective on August 1st. In 2016 and 2017 the increase will be paid in two equal installments. The first half of the increase shall become effective on August 1 of the specified year. The second half of the increase shall become effective on February 1 of the following calendar year. The total wage increases for each year will be as follows:

| Year | Increase |
|---|---|
| 2013 | seventy cents |
| 2014 | seventy cents |
| 2015 | seventy cents |
| 2016 | eighty cents |
| 2017 | one dollar |

Part-time employees still in progression on August 1, 2013 shall receive the above contractual increases and will be paid no less than what they are entitled to in accordance with the wage schedules in Article 22, Section 5(b) below. The progression set forth in (b) below shall be applied effective August 1, 2013.

(b) Newly hired part-time employees.

All part-time employees, who are hired or reach seniority after August 1, 2013 will be paid according to the following wage schedules:

|  | Hourly Rate | |
|---|---|---|
|  | Preloader Sorter | All Others |
| Start | $11.00 | $10.00 |
| Seniority plus one year | $11.50 | $10.50 |
| Seniority plus two years | $12.00 | $11.00 |
| Seniority plus three years | $13.00 | $12.00 |
| Seniority plus four years | $13.50 | $12.50 |

3

> Employees working high volume direct or low volume direct shall receive the preloader/sorter rates.
>
> (c)  The wage rates and increases provided in (a) and (b) shall be a minimum.

The Union also filed an unfair labor practice charge with the NLRB on September 15, 2015. It charged that by implementing the 2015 incentive program without bargaining in good faith with the Union, the Company violated Sections 7 and 8(a)(5) of the National Labor Relations Act. The NLRB Region 9 Director issued a deferral letter in November 2015, after which the Union filed another grievance repeating and incorporating both the original grievance claims and the unfair labor practice charge.

The disputed 2015 incentives were not the first non-negotiated incentives offered and paid to newly hired part-time employees in the Columbus area. In November 2013, the Company advertised for part-time Sunrise Shift Package Handlers who would be paid an hourly wage of $9.50 (fifty cents below the 2013 contract rate, presumably because the 2013-18 contract was not executed until April 2014) plus "up to a $400 attendance bonus by end of year." Great Lakes District Human Resources Manager Karl Martin testified that he met with Local 413 President Tony Jones shortly before that bonus offering was announced, told him there would be such an offer, albeit without exact details, and Jones told him "that was a good thing, these young people could use the money."

No Union official filed a grievance protesting that incentive offer but individual Local 413 member Nick Perry filed one on November 8, 2013, two days after the offer was advertised, complaining that it was not "approved" by the Union or the members and "should be applied to all Teamsters." That grievance cited no provision of the NMA or Central Region Supplement allegedly violated by that offer and still was pending when the Company implemented a similar program in 2014. (Pay stubs of two employees show weekly "retention bonuses" of $25 and $75 and in the latter case also a $75 "referral" bonus, in September and October 2014.) But when it was presented to the Central Region Joint Area Committee (JAC) in September 2015, the Union claimed the offers violated Article 19 Section 10 of the Central Region Supplement.

In a written statement to the JAC, a Union spokesperson summarized the claim this way: "The company testified at the state panel that article 19.10 of the central region does

4

not apply to inside workers only drivers in bonus centers.  Chairman Pat Darrow stated that is incorrect and that this did sound like an incentive program which is covered in that section." The JAC panel (with equal numbers of Company and Union representatives) reached the opposite conclusion and issued this majority decision: "Based on the facts presented in the instant case, there is no violation of Article 19, Section 10." As stated in Article 5 Section 2(c) of the Central Region Supplement, the "decision of the majority of the panel hearing the case shall be binding on all parties," so the Perry grievance went no further.  Nevertheless the Union also claimed the 2015 incentive offers violated Article 19 Section 10, arguing the JAC decision is not binding in this case and should be accorded no value as a precedent given its cursory nature and lack of explanation.

As happened in 2014, the Company announced another non-negotiated retention incentive program for new-hire part-time employees in April 2016, while the 2015 grievances still were pending.  The Union then filed another grievance on June 8, 2016 repeating and incorporating the 2015 grievance claims and unfair labor practice charge.  After deadlocks at the Ohio State Joint Committee and the JAC, the 2015-16 grievances were heard in September 2016 by the National Master Grievance Committee, which also deadlocked.  The issue presented to each committee was whether the Company violated Article 6 Section 1 of the NMA and Article 19 Section 10 of the Central Supplement by unilaterally implementing bonus incentive plans "without the approval of Local 413."  After the multiple committee deadlocks, the 2015-16 grievances were submitted to arbitration, where the Union added a claim that the incentive plans violated Article 22 Section 5(b) of the NMA, in that the incentives were a form of compensation/wages and as such conflict with the wage rates for newly hired part-time employees specified therein.

This issue is not one of first impression either, having recently been presented to and decided by national panel arbitrator Gary L. Axon in AAA Case No. 01-16-0002-7387 (Grievance No. N-16-66), which originated in the Western Region.  His decision, issued on June 20, 2017, summarized the facts in that case as follows:

> The seasonal and temporary employees are generally hired with no expectation of continued employment beyond a certain date. UPS has provided bonuses for these employees with the Union consent and blessings in the categories including drivers, driver helpers, and package handlers. The Union believes that the bonuses have never been offered to permanent, part-

>time package handlers. The Union learned in late 2015 that the bonus package program was going to include inside package handlers that were hired after October 1, 2015. The Union grieved and the matter was advanced through the grievance procedure to the National Master Grievance Committee (NMGC) where the grievance was deadlocked on May 26, 2016. The grievance was advanced to arbitration.
>
>In August 2016 [the Union] learned that UPS was planning to offer a similar retention bonus program during the peak season in 2016. The Union filed a second grievance over the 2016 bonus program [which] covered employees at the Swan Island facility. The second grievance expanded the scope to include all affected locations and all employees that were affected by the expanded bonus program.

According to Axon's summary of the parties' positions, the Union argued that NMA Article 22 Section 5 "only gives the Employer authority to give higher across-the-board hourly wage increases" and Section 5(c) "does not allow for bonus programs," because it applies only to "wage rates." It also argued its past consent to bonus programs for certain seasonal employees did not give the Employer a right to unilaterally implement "a bonus program for a small sub-group of permanent part-time package handlers."

Axon noted that NMA Article 22 Section 5(c) is not restricted to wage rates, but says "wage rates *and increases* provided in (a) and (b) shall be a minimum," and found those "terms should be broadly defined to mean overall compensation paid to part-time employees for their services," and "Bonuses are 'increases' that are expressly allowed under the disputed language." He found no conflict between those bonuses and Article 22 Section 5, and concluded that offering them to regular part-time package handlers thus did not constitute a "side agreement" with individual employees prohibited by Article 6 Section 1. He also found that the Company's decisions to extend bonus programs to regular part-time package handlers were "completely motivated by market conditions and business needs during the peak season" and there was no evidence that they were "arbitrary, discriminatory, capricious, or in bad faith."

Although the facts of this case and that one were not identical, the Company contends the NMA issues in the two cases are the same and since employees represented by all local unions included in the NMA constitute a single bargaining unit (as stated in its Article 2 Section 1), those issues should be considered conclusively resolved by Axon's decision for the duration of the NMA. With regard to the Union's claim that incentive programs in this case conflict with Article 19 Section 10 of the Central Region Supplement, the Com-

pany argues that question was conclusively answered by the 2015 JAC decision that incentive program(s) in 2013-14, which were essentially the same as those in 2015-16, did not violate Article 19, Section 10.  It also presented evidence (witness testimony and relevant language from all Central Region Supplements since 1987, when the original version of that provision became part of Article 19) that the incentive/bonus plans addressed therein are only those for package car drivers at centers that have such programs.  It thus argues that even if the JAC decision did not apply to this case, there is no conflict with Article 19 Section 10 because those provisions simply do not apply to incentives for part-time sort and preload employees.

The Company also presented documents showing that retention bonuses ranging from $100 to $250 were paid to many Local 413 employees in 2007 and 2008, without objection by the Union, and that they also received many "gift cards," but the Union convincingly argues the latter *were* "gifts," not compensation, so they do not support the Company interpretation of NMA Article 22 Section 5(c).  The Union also argues no extrinsic evidence (of alleged past practice, waiver or anything else) needs to or should be considered, because the language of the relevant contract provisions is clear and unambiguous.  As to Article 22 Section 5(c), it concedes the wages and increases specified in Sections 5(a) and (b) are not minimums; but as in the Axon arbitration, it argues that does not give the Company a right to bestow additional compensation on some bargaining unit employees but not others, or to give *any* such employee more compensation than specified in (a) and (b), without bargaining.  The Union also argues the Company interpretation of Article 19 Section 10 in the Central Region Supplement is not supported by its language, because a reference to package car drivers in only one of its four subsections is not proof that they are the only ones protected against implementation of new incentive or bonus plans without approval "by the affected employees and the Union."

## DISCUSSION AND FINDINGS

As filed, the grievances in this case alleged that two contract provisions were violated by the 2015-16 incentive programs: Article 6 Section 1 of the NMA, and Article 19 Sec-

7

tion 10 of the Central Region Supplement. The Company offered similar incentives in 2013, which an individual member of Local 413 protested in a grievance that identified no specific contract violation. The Union took that grievance to the State and Joint Area Committees, arguing to those two panels that the Company violated Article 19 Section 10 by offering the incentive program without negotiation or Union approval. The incentives in that case differed in some details from the 2015-16 programs, but not in any material respect concerning application or alleged violation of Article 19 Section 10. A majority of the JAC panel decided that "on the facts presented in [that] case, there is no violation of Article 19, Section 10." As provided in Article 5 Section 2(c), that decision was "binding on all parties," and the parties accepted it as such, but the Union made the identical claim in these grievances.

There being no material difference between the 2013-14 and 2015-16 incentive programs, that claim also is barred by Article 5 Section 2(c). The Union argues it should not be because the February 2015 JAC decision did not explain *how or why* there was no violation of Article 19 Section 10 in the earlier case, but this argument is unconvincing. The State and Joint Area Committees were not new inventions in 2013, so the parties presumably knew their decisions were merely conclusory, without narrative factual summaries or detailed contractual analysis or explanation such as would be expected in arbitration decisions. But they agreed that decisions by a majority of a JAC "panel hearing the case shall be binding on all parties" without requiring any explication of the rationale for such decisions, so the form of the February 2015 JAC decision was exactly what they bargained for and was, *and is*, "binding on all parties" despite its brevity and lack of explication.

Its binding effect extends to this case, not just the 2013 grievance, because limiting that mandate to a particular case and specific parties involved therein would conflict with the statement that such decisions "shall be binding on *all* parties." The Central Region includes multiple local unions, so that statement plainly means such decisions set precedents for future cases that involve the same issues. Similarly, NMA Article 8 Section 3, which says the Union and Employer may "review and reverse . . . decisions by any area, regional or local grievance committee which interprets Master language erroneously,"

8

recognizes that lower panel decisions may "set a precedent for future grievances." More generally, relitigating the identical issue decided in one case in subsequent cases during the term of the Supplemental Agreement would encourage panel shopping and defeat the objectives of efficiency and finality that are fundamental to *any* grievance procedure, including the ones provided in the NMA and the Regional Supplement.

The Regional Supplement has no procedure to review and reverse erroneous interpretations of its language by the JAC, nor would that seem necessary, since a majority decision by a panel with equal Employer and Union representation should accurately reflect the mutual intent of the parties who bargained the language. But were I to assume such authority in deciding whether the JAC decision in the earlier case is controlling precedent for this one, I would find that the Union did not prove the JAC erroneously interpreted the language of Article 19 Section 10. The Company's position that it does not apply to incentives for newly hired, non-seniority part-time sort and preload employees, but only to established bonus plans for package car drivers, is consistent with that language as currently written and as it evolved in several previous contracts, and with unrefuted testimony of Company witnesses. For these reasons, I find the 2015-16 programs did not violate Article 19 Section 10, and as to that claim the grievance must be denied.

The same reasoning applies to the Union's claim that those programs violated NMA Article 6 Section 1, for the following reasons. Arbitration of grievances that "raise an issue of interpretation of a Master Agreement Article or Section," as defined in Article 8 Section 6, is described as "binding" in both Sections 4 and 7 of Article 8. Thus it is clear that the parties bargained for finality of such arbitration decisions not only as to a particular grievance being arbitrated, but also to the "*issue of interpretation* of a Master Agreement Article or Section" presented therein, and an arbitrator's decision in such a case resolves both that specific dispute about the meaning and application of an NMA Article or Section *and* the broader "issue of interpretation" of that provision, and in effect becomes part of the NMA for the remainder of its term. As such, it must be respected and applied by arbitrators in subsequent cases presenting the same issue. To do otherwise would deprive the parties of the benefit of their bargain; encourage abuse of the grievance and ar-

bitration procedure and confusion and irreconcilable conflict in application of contract provisions interpreted differently by different arbitrators; and violate NMA Article 8 Section 6, which says the arbitrator has "authority to apply the provisions of this Agreement and to render a decision on any grievance coming before him/her but shall not have the authority to amend or modify this Agreement or to establish new terms or conditions of employment."  Arbitrator Axon's decision on Grievance No. N-16-66 thus is binding upon the parties and the arbitrator in this case, and controls its resolution.

He concluded that incentives for part-time inside package handlers such as the ones in the Western Region in that case do not violate Article 6 Section 1 or Article 22 Section 5(b), because UPS "retained the authority" in Article 22 Section 5(c) "to pay more than the negotiated minimum rate."  He also noted that the Employer could not exercise such authority in bad faith or an "arbitrary, discriminatory [or] capricious" manner, but found no such defects in management's decisions in that case, because they "were completely motivated by market conditions and business needs during the peak season."

Undisputed evidence in this case supports the same conclusion, and for purposes of Article 22 Section 5 there is no material difference between the incentives for part-time inside package handlers in that case and those for newly hired, non-seniority, part-time sort and preload employees in this one.  Therefore it also must be concluded that incentives offered and paid to newly hired, non-seniority, part-time sort and preload employees in the Columbus area in 2015-16 did not violate NMA Article 22 Section 5.  Nor did the Company violate Article 6 Section 1, because offering or paying such incentives and/or getting signatures from affected employees acknowledging their receipt of the incentive guidelines did not constitute extra-contract agreement with them in conflict with Article 22 Section 5 or any other provision of the NMA.

It unilaterally established and implemented those programs as an appropriate exercise of authority reserved by it in Article 22 Section 5(c), and did so in good faith for legitimate business reasons, so Grievance No. N-16-97 must be denied as to the claim of violation of NMA Article 6 Section 1 as well.  These findings also should resolve the unfair labor practice charge in NLRB Case 09-CA-159868, because the Employer had no duty

10

to bargain for the right to exercise management authority already bargained for and reserved in Article 22 Section 5(c), so it did not violate Section 7 or 8(a)(5) of the National Labor Relations Act by implementing the disputed incentive programs unilaterally.

## AWARD

Grievance No. N-16-97 is denied.

*Paul Glendon*

Paul E. Glendon, Arbitrator
August 8, 2017

11