# Exhibit H

IN THE MATTER OF ARBITRATION            )
                                        )        AAA CASE NO. 01-16-0002-7387
BETWEEN                                 )
                                        )        GRIEVANCE NO. N-16-66
INTERNATIONAL BROTHERHOOD               )
OF TEAMSTERS LOCAL 162,                 )        ARBITRATOR'S OPINION
                                        )
Union,                                  )        AND AWARD
                                        )
and                                     )        RETENTION BONUS GRIEVANCES
                                        )
UNITED PARCEL SERVICE, INC.,            )
PORTLAND, OREGON,                       )
                                        )
Employer.                               )


HEARING SITE:                                    Airport Sheraton
                                                 Portland, Oregon

HEARING DATE:                                    March 31, 2017

RECORD CLOSED ON RECEIPT OF BRIEFS:              May 23, 2017

REPRESENTING THE UNION:                          Michael J. Tedesco
                                                 Tedesco Law Group
                                                 12780 SE Stark Street
                                                 Portland, OR  97233

REPRESENTING THE EMPLOYER:                       Tony C. Coleman
                                                 Frost Brown Todd, LLC
                                                 400 West Market Street, Suite 3200
                                                 Louisville, KY  40202-3363

ARBITRATOR:                                      Gary L. Axon
                                                 P.O. Box 190
                                                 Ashland, OR  97520

I.        **INTRODUCTION**

The case before the Arbitrator arises out of two grievances filed by Teamsters Local 162 (Union) protesting the United Parcel Service's (UPS or Employer) retention bonuses offered to part-time inside package handlers hired after October 1, 2015.  The first grievance (Grievance # 19213) dated October 27, 2015 protests the Employer "offering a Bonus of up to $450.00 to Swan Island inside package handlers hired after October 1, 2015.  Local 162 is seeking compliance with the CBA by having the Company extend the same offer to all Swan Island inside package handlers."  Un. Ex. 2.

In the second grievance (Grievance # 20237) dated October 10, 2016 the Union protested "the Company offering a bonus to certain regular local 162 bargaining unit employees hired on or after September 1, 2016.  This grievance is a continuation of grievance 19213 that is scheduled for arbitration.  Make all affected bargaining unit employees whole in every way."  Un. Ex. 14.

UPS denied both grievances stating there were no contract violations.  The grievances were processed to the National Grievance Committee (NGC).  The NGC deadlocked on both grievances.  When the parties were unable to agree on a resolution of the grievances during the lower levels of the grievance procedure, the Union advanced the cases to arbitration. The two grievances were consolidated for hearing before this Arbitrator.

II.        **STATEMENT OF THE ISSUE**

The parties were extremely close on a stipulated statement of the issue, but differed on wording.  The Arbitrator adopts the Employer's statement of the issue that reads:

> When the Employer unilaterally implemented a retention and hiring bonus program for the part-time inside employees in 2015 and 2016, did the Employer violate Article 23 (Maintenance of Standards) and Article 10 (Priority of Agreement) of the Western Region Supplemental Agreement; Article 3, Section 1 (Recognition) and Article 6, Section 1 (Extra Contract Agreements) of the National Master Agreement?
>
> If so, what is the appropriate remedy?

If the grievance is denied, the issue of remedy becomes moot.  If the Union prevails in this matter, the remedy issue will be returned to the parties for appropriate computations and calculations.  The Arbitrator will retain jurisdiction for ninety (90) days after the issuance of the Award to assist with the implementation of the remedy, if any.

III.       **RELEVANT CONTRACTUAL PROVISIONS**

### National Master UPS Agreement

### ARTICLE 3. RECOGNITION, UNION SHOP AND CHECKOFF

#### Section 1. Recognition

(a)  The Employer recognizes and acknowledges that the National Union Committee and Local Unions affiliated with the International Brotherhood of Teamsters are the exclusive representatives of all employees of the Employer in covered classifications.  The employees and Unions covered under this Master Agreement and the various Supplements, Riders and Addenda thereto shall constitute one (1) bargaining unit.

2

## ARTICLE 6.

### Section 1.  Extra Contract Agreements

Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement.  Any such Agreement or document shall be null and void.  Any such agreement or document may not be placed in an employee's file or used by the Employer as a basis for discipline or used in connection with any disciplinary proceeding, nor may any such agreement or document nor the contents thereof be divulged to any person or entity.

## ARTICLE 22.  PART-TIME EMPLOYEES
...

### Section 5.  Wages

(a)  Part-time Employees

...

(b)  Newly hired part-time employees

...

(c)  The wage rates and increases provided in (a) and (b) shall be a minimum.

...

## The Western Region of Teamsters UPS Supplemental Agreement

## ARTICLE 4 – SENIORITY
...

(c) – PROBATIONARY PERIOD (PART-TIME)

A new part-time employee shall attain seniority when he/she has worked seventy (70) days within a six (6) consecutive month period.  Prior to attaining seniority, as defined in this

3

Section, the employee shall be considered a probationary employee and may be discharged without such discharge being subject to the grievance procedure. However, the Employer shall not discharge or otherwise discipline a probationary employee for purposes of evading the terms of this provision or to discriminate against Union members. Upon completion of the probationary period, the employee shall be given a seniority date as of his/her first day worked within such six (6) month period.

Notification will be made to all Local Unions within seven (7) days of employment of all new hires. Information will include name, address, social security number, last employer, classification hired into, and date of hire.

...

## ARTICLE 5 – SEASONAL PERIOD

The seasonal period shall be defined as the period October 1st through December 31st, inclusive, of any year.

A seasonal employee is a full-time temporary employee who is hired between October 1st and December 31st, inclusive of any year, and shall not accrue seniority or service credit for any purpose during this period. Any full-time employee hired prior to October 1st of any year shall continue to accrue seniority during this seasonal period in accordance with the seniority provision of this agreement.

## ARTICLE 10 – PRIORITY OF AGREEMENT

The Employer agrees not to enter into any agreement or contract with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this agreement. Any such agreement shall be null and void.

## ARTICLE 23 – MAINTENANCE OF STANDARDS

The Employer agrees that all conditions of employment in his individual operation relating to wages, guaranteed hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be improved whenever specific provisions for improvement are made elsewhere in this Agreement.

4

It is agreed that the provisions of this Article shall not apply to inadvertent or bona fide errors made by the Employer or the Union.

Any disagreement between the Local Union and the Employer, with respect to this matter, shall be subject to the grievance procedure.

This provision does not give the Employer the right to impose or continue wages and hours less than those contained in this Agreement.

IV.     **STATEMENT OF FACTS**

UPS is a common carrier engaged in the pickup and delivery of packages throughout the United States and most of the world. The number of package operation employees mushrooms each November and December due to the increased peak volume during the holiday season.

The Union is the exclusive representative for a large number of UPS employees across the country. The Teamsters and UPS are parties to the National Master United Parcel Service Agreement (NMA). In addition to the NMA, the Teamsters and UPS have negotiated sub-agreements that provide for additional terms and conditions of employees within certain regions and sub-regions. Relevant to this case, the parties are entered into the Western Region Supplemental Agreement (WRSA) covering 11 western states. Teamsters and UPS have entered into a Joint Council 37 Package Rider (JC37 Rider) that applies to several Teamsters Locals, including Local 162. Teamsters Local 162 represents UPS employees in Oregon.

There is little dispute that the decision to pay retention bonuses and higher hourly rates to seasonal employees is driven by market forces. Permanent employees

enjoy pension and health and welfare plans that are worth substantial monetary benefits. Employees hired for peak operations only, do not participate in the benefit and health insurance programs. They receive pension contributions, but do not remain employed long enough for the benefits to vest. Part-time inside employee jobs within the Local 162 jurisdiction are even more difficult to fill since Local 162 charges the peak part-time inside employee's initiation fees and dues. The higher wages and bonus payments are necessary to attract qualified employees to work a limited amount of time during the peak season.

### The 2015 Retention Bonus Program

The seasonal and temporary employees are generally hired with no expectation of continued employment beyond a certain date. UPS has provided bonuses for those employees with the Union consent and blessings in the categories including drivers, driver helpers, and package handlers. The Union believes that the bonuses have never been offered to permanent, part-time package handlers. The Union learned in late 2015 that the bonus package program was going to include inside package handlers that were hired after October 1, 2015. The Union grieved and the matter was advanced through the grievance procedure to the National Master Grievance Committee (NMGC) where the grievance was deadlocked on May 26, 2016. The grievance was advanced to arbitration.

6

### The 2016 Retention Bonus Program

In August 2016, Mark Davison, President of Local 162, learned that UPS was planning to offer a similar retention bonus program during the peak season in 2016. The Union filed a second grievance over the 2016 bonus program. The 2015 grievance covered employees at the Swan Island facility. The second grievance expanded the scope to include all affected locations and all employees that were affected by the expanded bonus program.

The parties met on October 16, 2016, at a senior level grievance meeting over the 2016 bonus program. The parties were unable to resolve the dispute, but did agree to consolidate the first and second grievances for arbitration.

A hearing was held at which time both parties were accorded the full and complete opportunity to present evidence and argument in support of their respective positions. Post-hearing briefs were timely filed. The issue is now properly before the Arbitrator for a final and binding decision.

### V.        POSITIONS OF THE PARTIES

#### A.      The Union

The Union begins by asserting the Arbitrator should exclude the exhibits and testimony offered by UPS in support of its purported past practice claims. First, the past practice is irrelevant in this case because the contract language is clear and unambiguous.

Second, UPS effectively waived any right to assert a past practice claim as it was never once suggested in the pre-arbitration steps of the grievance process that

7

there was such a practice. As a result, the Arbitrator should conclude the Employer waived its right to assert a past practice claim.

Third, the information submitted by UPS should also be excluded because UPS failed to provide that information to the Union during the grievance process, even though the Union submitted multiple requests as far back as November 2015. The Union submits that the Arbitrator should not reward UPS for "hiding the ball."

The Union next argues the clear language of the contract prohibits UPS from entering into side agreements with employees for bonuses. According to the Union, UPS cannot unilaterally implement new bonus programs for selected groups of employees while denying those bonuses to other employees who perform the same job, and literally work side by side with the employees who receive the bonus. The contract does not allow for unchecked management authority to do whatever it wishes with regard to bonuses and employee compensation.

Article 6, Section 1 of the NMA states that "the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement." Article 10 of the Western Region Supplemental Agreement contains a similar provision that prohibits side agreements. Here, an agreement was clearly made with seasonal employees through advertisements and statements offered during the hiring process.

UPS violated Article 23, Maintenance of Standards, because it provided a small group of employees with a bonus not available to other employees in the same

8

classification, solely based on date of hire.  Under Article 23, UPS is obligated to provide the same bonus program to all similarly situated employees.

The Arbitrator should reject the selective interpretation of Article 22, Part-Time Employees, Section 5, by UPS because the contract only gives the Employer authority to give higher across-the-board hourly wage increases.  Further, the contract uses the term "wage rates" in Article 22, Section 5(c) that does not allow for bonus programs.

Regarding the Employer's position on past practice, the Union asserts there is no past practice supporting UPS's position.  The Union is unaware of any alleged practice regarding bonuses, and certainly did not approve of any such bonuses. In addition, the Arbitrator should reject UPS's intent to use past practice because the Employer waited until the arbitration hearing to even raise the past practice issue.  Thus, the Union was denied the ability to effectively challenge the evidence and was severely prejudiced.

Moreover, the Arbitrator should reject UPS's assertion there is no distinction between seasonal employees and permanent part-time package handlers. The Union strongly disputes this assertion.   The seasonal employees have no expectation of continued employment after the peak season ends.   In contrast, permanent part-time package handlers do have an expectation of continued employment and are covered by all terms of the Union contract.

Article 5 of the Western Region Supplemental Agreement contains specific language defining seasonal employees and setting forth the dates when seasonal employees are hired and when they are normally terminated.  The Union is aware of,

9

and has approved of, the bonus program for seasonal employees because they do not receive all benefits provided under the NMA and the applicable sub-agreements. The bonuses for seasonal employees have been made available across the board to those employees who met the requisite benchmarks.

> The Union concluded in its post-hearing brief as follows:

> UPS violated Articles 3 and 6 of the NMA, and Articles 10 and 23 of the Western Regional Supplement, <u>when it unilaterally implemented a bonus program for a small sub-group of permanent part-time package handlers represented by the Union</u>. The Union would request that the Arbitrator issue an award ordering UPS to cease and desist unilaterally implementing bonus programs unless UPS negotiates the terms of the bonus program with the Union. Further, the Union requests that the Arbitrator order UPS to retroactively pay the full bonus amounts for each year to all permanent part-time package handlers that were employed during the time that the respective bonus programs were offered in 2015 and 2016, but did not receive the bonuses. The Union also requests that the Arbitrator retain jurisdiction over this case for 90 days to resolve any disputes concerning the award issued.
>
> Un. Brief, pp. 24 –25; emphasis added.

## B. United Parcel Service

UPS takes the position the Union must demonstrate by a preponderance of clear and convincing evidence that UPS violated the contract. As such, the Union must demonstrate that its interpretation of the contract is more plausible than that of the Employer. The evidence presented in this matter does not establish a violation of the labor contract and must be denied.

UPS next argues the language of Article 22, Section 5(c) of the NMA is clear and unambiguous and should be enforced as written. Section 5(c) provides: "The wage rates and increases provided in (a) and (b) shall be a minimum." The words are

10

clear and unambiguous on their face. The provision gives UPS the right to pay part-time hourly employees "wage rates and increases" higher than what is set forth in (a) and (b) above. There is nothing within the provision that limits its application to seasonal employees. There is nothing within Article 22, Part-Time Employees that requires UPS to pay all employees within a job classification the higher "wage rates and increases." Adoption of the Union's interpretation would provide the nonsensical result to find that management is only obligated to pay the specified hourly rates because of an additional provision prohibiting the Employer from paying less.

The Arbitrator should reject the Union's interpretation that management was limited to increases in hourly rates, but only to the extent UPS bargained with the Union and applied increases to all employees. There is no basis to find the provision carries with it an obligation to bargain with the Union. Imposing such an obligation would make the provision meaningless, as UPS can always go to the Union to bargain terms different than what is provided in the contract. There are numerous examples in the contract where the parties mandated that an action could not be taken absent mutual agreement or negotiations with the affected Union. No such obligation is reflected in Article 22, Section 5(c). If the parties intended Article 22, Section 5(c) to be limited to hourly pay rates, they could have easily said hourly pay rates shall be a minimum.

Moreover, the bonuses offered by the Employer are legally required to be considered as part of the employee's wage rate for purposes of overtime. Bonuses are legally considered to be part of an employee's hourly wage rate.

11

UPS has compelling business reasons to offer the higher hourly rates and/or bonuses to peak part-time employees. The Union concedes the fact that employment-marketing conditions allows UPS to hire necessary staffing for its peak operations.

In sum, the Arbitrator should conclude that Article 22, Section 5(c) is clear on its face and allows UPS to pay peak, part-time inside employees the retention bonuses.

If the Arbitrator concludes Article 22, Section 5(c) is deemed ambiguous, past practice supports the Employer's interpretation. Testimony of UPS witnesses established that UPS has a long established, open and consistent practice of extending hourly wage rate increases and bonuses to full-time feeder and package drivers, part-time helpers, and part-time inside employees.

Contrary to the Union's claim at arbitration, the UPS evidence on past practice was offered to support an interpretation of the disputed language. UPS is not attempting to establish for the first time an implied term of the contract. Rather, the evidence of past practice is offered as interpretive evidence only. UPS did not introduce a new claim at the hearing of this matter but, that Article 22, Section 5(c) allowed management to grant higher wages to peak season hires.

Even if the issue is limited to the use of peak season bonuses to part-time inside employees, the evidence of such practice is overwhelming. Employer Exhibit 6 and testimony of management witnesses established that UPS has repeatedly extended peak season higher compensation to part-time inside employees. Prior to this

12

grievance, the Union has filed no objections to the past practice of using seasonal retention bonuses.

The lynch pin of the Union's argument in this case is that part-time inside employees are contractually different than seasonal employees and part-time helpers which are specifically allowed to be hired for peak operations by Article 1, Section 1 of the JC37 Sort Rider. The distinction urged by the Union does not exist. First, neither Article 22, Section 5(c) nor Article 17 makes a distinction between seasonal and non-seasonal employees. UPS has not applied any distinction in the past.

Second, the Articles on which the Union relies to argue that peak season bonuses to part-time inside employees are a violation, applies equally to all employees seasonal or non-seasonal. The Union's reliance on Article 6 of the NMA and Articles 10 and 23 of the WRSA fare no better. There is basis to find that those provisions apply to part-time inside employees, but not the full-time seasonal or part-time seasonal helpers. The distinction simply does not exist. Employer witnesses provided unrebutted testimony that part-time inside employees are viewed and treated the same as other seasonal employees. That is, they are informed when hired they are being employed for a peak period and will be separated at the end of the peak. Like other seasonal full-time hires and part-time seasonal helpers, peak inside part-time employees do not receive health insurance and do not vest in any pension.

For all of the above-stated reasons, the Employer submits there is no contractual basis to differentiate between employees classified as seasonal and part-time regular employees.

13

Turning to the Union's position that Article 6 prohibits UPS from entering into an agreement or contract with its employees, the Employer maintains it was specifically permitted by the NMA pursuant to Article 22, Section 5(c) to offer the retention bonuses to seasonal employees. UPS's actions in the instant case are consistent with Article 22, Section 5(c). If UPS peak payments are allowed by this section of the contract, Article 6 cannot be held to prohibit it.

Likewise, the Union's position that Article 10 of the WRSA parallels Article 6 of the NMA and provides UPS cannot enter into any agreement, individually or collectively, which conflicts with the labor agreement is not persuasive. Nothing within Article 23, Maintenance of Standards can be read to prohibit UPS from paying more than what it is contractually required.

The Employer concluded in its post-hearing brief as follows:

> The evidence in this case demonstrates that UPS is in a competitive business environment in which it is critical for the Company to attract and retain extra staffing for a short period of time. UPS' competition, which is primarily non-union and largely relies on subcontractors, compels it to control its cost in providing these services.
>
> As the Union itself noted, UPS provided a very attractive health and welfare and pension package to its permanent full and part-time employees. Local 162's position that UPS must extend the same bonuses to all employees would result in a windfall to regular employees and serve no purpose other than make UPS more non-competitive.
>
> UPS is not taking the position that it can pay any employee any wage rate or bonus. Rather, as reflected in the decision by Arbitrator Elliott Goldstein, UPS' practice must not be 'unreasonable, unfair, arbitrator [sic] or discriminatory.' *Northwest Beverage Co., supra.* Similarly, Arbitrator Fogleberg's rendition of the standard in the UPS decision in **Attachment E** is that management's decisions cannot be 'arbitrary, capricious or otherwise made in bad faith.'

14

UPS' actions in this matter fully complies with these standards.  UPS' decisions were completely motivated by market conditions and business needs.  They were in no way arbitrary, discriminatory, capricious or in bad faith.

Er. Brief, p. 26; emphases added.

## VI.    DISCUSSION

The Arbitrator holds the Union failed to prove by a preponderance of the evidence UPS violated Article 23, Maintenance of Standards, and Article 10, Priority of Agreement, of the Western Region Supplemental Agreement; Article 3, Section 1, Recognition, and Article 6, Section 1, Extra Contract Agreements of the National Master Agreement when UPS implemented a retention and hiring bonus program for the part-time package handlers in 2015 and 2016.   This conclusion is supported by an examination of the contract language and evidence presented at the arbitration hearing. Accordingly, the grievance will be denied.  The parties' detailed arguments in the post-hearing briefs are summarized in Section V, Positions of the Parties, of this Award and will not be repeated.  The reasoning of the Arbitrator is set forth in the discussion that follows.

The job announcement for Package Handler – Part-Time, stated in relevant part:

UPS is hiring individuals to work as part-time Package Handlers.

Jt. Ex. 2(b); emphasis added.

This description is in sharp contrast to the job announcement for the other jobs where the reference to positions clearly stated in pertinent part:

UPS is accepting applications for temporary, seasonal full-time Package Delivery Drivers.

…

15

> UPS is hiring individuals to work as <u>temporary Driver Helpers</u>.
>
> ...
>
> UPS is hiring individuals to work as <u>full-time, temporary, seasonal Tractor-Trailer Drivers</u>.
>
> Jt. Ex. 2(b); emphases added.

It is this job posting and others for the part-time package handlers that triggered the instant grievances.

The function of the Arbitrator is to determine and give effect to the intent of the parties as expressed in the NMA and Western Region Supplemental Agreement. This begins with an examination of the text of the disputed provisions and the context of the agreement as a whole. If the language is clear and unambiguous, an arbitrator should enforce the agreement of the parties without further analysis. Contract language is considered ambiguous if, in context, it is reasonably susceptible to more than one interpretation. Only then will extrinsic evidence, such as past practice and bargaining history be considered in determining what the parties intended when they adopted ambiguous language.

The Arbitrator holds the Union has not advanced a plausible contention for a conflicting construction of the controlling language in dispute. The controlling language to resolve the stipulated issue is contained in Article 22, Part-Time Employees, of the NMA and Article 5, Seasonal Period, of the WRSA. Article 5, Seasonal Period reads as follows:

> The seasonal period shall be defined as the period October 1st through December 31st, inclusive, of any year.
> <u>A seasonal employee is a full-time temporary employee who is hired between October 1st, and December 31st,</u> inclusive of any year, and shall not accrue seniority or service credit for

16

> any purpose during this period.  Any full-time employee hired prior to October 1st of any year shall continue to accrue seniority during this seasonal period in accordance with the seniority provision of this agreement.
>
> > Emphasis added.

The focus of the October 27, 2015 grievance is over the unilateral implementation of the bonus system for part-time inside package handlers that were hired after October 1, 2015 at Swan Island.  The second grievance challenged the 2016 bonus program as a continuation of the violations asserted in the 2015 grievance, but expanded the scope to include all affected locations and employees.  In clear and unambiguous language Article 5 defines a seasonal employee as a "full-time temporary employee who is hired between October 1st and December 31st."

The part-time package handlers were <u>not</u> hired as "full-time temporary employee(s)."  They were hired as regular part-time employees so Article 5, Seasonal Period does not apply to this group of part-time employees.

Article 22, Part-Time Employees, Section 5 sets a wage schedule for part-time employees.  The critical language in Article 22 is found in Section 5(c) that reads as follows:

> (c)  The wage rates and increases provided in (a) and (b) <u>shall be a minimum</u>.
>
> > Emphasis added.

Article 22, Part-Time Employees establishes the terms and conditions for part-time employees.  Section 5(a) creates a wage scale and a set of wage increases. Section 5(b) establishes the wage rates for all newly hired part-time employees.  There is nothing in the language of Article 22 that prohibits management from providing "wage rates and increases" above the negotiated rates for part-time employees.

17

In clear and unambiguous language, the parties have agreed the "wage rates and increases provided in (a) and (b) <u>shall be a minimum</u>."  Emphasis added. There is nothing ambiguous about Section 5(c).  The parties used mandatory language that the wage rates and increases "shall be a minimum."  By the use of the word "shall," there is no room for doubt that the wage rates and increases are a minimum.  The clear implication is UPS has retained the authority to pay more than the negotiated minimum rate.

Nothing in Article 22, Section 5(c) can be interpreted as a prohibition on UPS from paying more than the rates set forth in Article 22, Sections 5(a) and (b).  The exercise of the specifically retained power to provide "wage rates and increases" over the minimum does not constitute a side agreement that violates the NMA or the WRSA.

I hold the Union has not advanced a plausible contention for a conflicting construction of Section 5(c) that provides the wage rates and increases "shall be a minimum."  The duty of your Arbitrator is to give effect to the parties' intent as evidenced in the plain language of the NMA.   The Arbitrator cannot ignore the definitive and literal meaning apparent on the face of the contract that wages and increases "shall be a minimum."

Adoption of the Union's interpretation would require your Arbitrator to ignore and modify the agreed-on language that wage rates and increases "shall be a minimum."  The Union's interpretation would have this Arbitrator read Article 22, Section 5(c) to preclude UPS from providing more than the wages set forth in Article 22, Sections 5(a) and (b).   I am not free to amend, add to, modify, or revise the express

18

language agreed to by the parties. Therefore, I must reject the Union's contract construction.

Having given effect to all the words in the parties' agreement, and having found the contract language before me clear and unambiguous, I find the Employer's claims of past practice and bargaining history to be immaterial.

Turning to the Union's claim that the NMA prohibits UPS from entering into side agreements with employees for bonuses, I disagree. According to the Union, Article 22, Section 5(c) is limited to wage increases. I hold the contract language does not support the Union's position. In my judgment, when the parties used the terms "wage rates and increases" they intended the terms should be broadly defined to mean overall compensation paid to part-time employees for their services. Section 5(c) refers to "wage rates and increases." Bonuses are "increases" that are expressly allowed under the disputed language. Further, I agree with the Employer that bonuses are properly considered as part of the employee's hourly wage rate.

Moreover, the Union argued that the extension of the bonus program to part-time inside package handlers constituted a side agreement between the Employer and the individual employee that is prohibited by the contract. Article 22, Part-Time Employees, Section 5(c) establishes the "minimum" pay for part-time employees. In plain language, Section 5(c) specifically reserves the managerial prerogative to pay wages in excess of the minimum set for part-time regular employees covered by Article 22. The reasonable exercise of a managerial prerogative to pay more than the minimum rate cannot be interpreted to prevent the extension of the seasonal bonus retention plans at issue in this arbitration to the regular part-time package handlers. Thus, I must

19

reject the Union's argument that the contract prohibits UPS from extending the bonus programs, to inside regular part-time package handlers that are the subject of the grievances.

In sum, I find management's decisions were completely motivated by market conditions and business needs during the peak season. Absent from this record is any evidence that would support a finding that management's decisions regarding the payment of retention bonuses to part-time package handlers was arbitrary, discriminatory, capricious, or in bad faith.

## <u>AWARD</u>

Having reviewed all of the evidence and argument, and having had the opportunity to observe the demeanor of the witnesses at arbitration, the Arbitrator finds UPS did not violate the parties' National Master Agreement or the Western Region Supplemental Agreement when management unilaterally implemented a retention and hiring bonus program for part-time inside package handlers hired during 2015 and 2016. The grievance is denied and dismissed in its entirety. The fees and expenses of the Arbitrator are payable equally by the parties.

Respectfully submitted,

Gary L. Axon

Gary L. Axon
Arbitrator
Dated: June 20, 2017

21