# Exhibit I

**IN THE MATTER OF ARBITRATION BETWEEN:**

Teamsters Local 623    :
   The Union    :    Opinion
           :
           :     and
- and -       :
           :    Award
UPS         :
   The Company   :

Grievances:  N-18-26 and N-18-17 (Consolidated)
AAA Case No. 01-18-004-4376

<u>Before</u>

Margaret R. Brogan, Esquire
Arbitrator

<u>Appearances</u>

<u>For the Union</u>

Neal Goldstein, Esquire
Vlad Kachka, Esquire
Freedman and Lorry, P.C.
1601 Market St., Suite 1500
Philadelphia, PA 19103

<u>For the Company</u>

Tony C. Coleman, Esquire
Frost Brown Todd LLC
400 West Market St., 32nd Floor
Louisville, KY 40202

A hearing was held at the offices of the American Arbitration Association in Philadelphia on May 9, 2019.   At that time the parties were afforded the opportunity to introduce all relevant testimonial and documentary evidence.  No stenographic record was made of the proceedings. After the hearing, the parties filed written briefs, which were served on the undersigned by the American Arbitration Association on July 3, 2019.

At hearing, the parties were unable to agree upon the issue before me, but granted me the jurisdiction to frame the issue based upon the evidence and the arguments presented.  This matter involves grievances submitted to and deadlocked at the National Grievance Committee (NGC), involving questions of interpretation arising under the provisions of the National Master Agreement between United Parcel Service and the International Brotherhood of Teamsters (NMA). In line with Article 8 of the NMA, the Submissions to the NGC, and applicable precedent, I am limited to a consideration of the issues upon which the NGC was deadlocked, absent mutual agreement otherwise. In this case, there was no mutual agreement to grant the arbitrator jurisdiction to consider issues outside that specified in the Submissions.  (*UPS and Teamsters Local 639,* N-322-05 at 12-14*; Tener, Arb., 2006*)

Therefore, I find the issue in this proceeding to be as follows:

1

**ISSUE**

Whether the Company violated NMA Article 6 and/or Article 22, Section 5(b) by implementing wage changes that were not negotiated; and if so, what shall be the appropriate remedy? (JXs 4 and 7)

**RELEVANT CONTRACTUAL PROVISIONS**

**NATIONAL MASTER UPS AGREEMENT 2013-2018**

Article 2.  Scope of the Agreement

Section 1.  Single Bargaining Unit

All employees covered by this Master Agreement and the various Supplements, Riders and Addenda thereto, shall constitute one (1) bargaining unit.  The printing of this Master Agreement and the aforesaid Supplements, Riders and/or Addenda in separate agreements is for convenience and is not intended to create separate bargaining units.

Article 6

Section 1. Extra Contract Agreements

Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement.  Any such Agreement or document shall be null and void. Any such agreement or documents may not be placed in an employee's file or used by the Employer as a basis for discipline or used in connection with any disciplinary proceeding, nor may any such agreement or document nor the contents thereof be divulged to any person or entity.

2

Article 8.  National Grievance Procedure

Section 1.

All grievances and/or questions of interpretation arising under the provisions of this National Master Agreement shall be resolved in the following manner:

Deadlocked cases involving only National Master language may be submitted to the National Master Panel for decisions.  Those deadlocked cases which cannot be decided by a lower panel because of a disagreement over the interpretation of the National Master language may be submitted to the Master Panel for interpretation…

Section 4

Where the National Grievance Committee fails to reach a majority decision as to any case submitted pursuant to this Article (excepting arbitration decisions) either party shall have the right to refer the case to binding arbitration.  Either party wishing to submit a grievance to arbitration must do so within ten (10) days of mailing or hand delivery of the National Grievance Committee deadlock decision. The arbitrator is to be selected from an American Arbitration Association national panel list and all aspects of the arbitration procedure shall be governed by the Rules of the American Arbitration Association.

Section 5.

Any grievance that does not raise an issue of interpretation of a Master Agreement Article or Section shall be resolved pursuant to the provisions relating to the local, state and area grievance procedure set forth in the applicable Supplements, Riders and Addenda.  Prior to invoking the arbitration procedure the parties, by mutual agreement, may submit said case to the National Grievance Committee for resolution….

Section 6.

The arbitrator shall have the authority to apply the provisions of this Agreement and to render a decision on any grievance coming before him/her but shall not have the authority to amend or modify this Agreement or to establish new terms or conditions of employment…

3

<u>Section 7.</u>

Deadlocked cases referred from the National Grievance Committee to binding arbitration pursuant to this Article, will be governed by the following procedures:

>    1.  The arbitration process will be administered by the offices of the American Arbitration Association…

<u>Article 17.  Paid for Time</u>

All employees covered by this Agreement shall be paid for all time spent in service of the Employer.  Rates of pay provided for by this Agreement shall be minimums…

<u>Article 22.  Part-Time Employees</u>

<u>Section 5.  Wages</u>

(a) Part time Employees

>    All part-time employees who have attained seniority as of August 1, 2013 will receive the following general wage increases for each contract year.  In the first three (3) years of the contract, the increase will be effective on August 1st.  In 2016 and 2017 the increase shall be paid in two (2) equal installments.  The first half of the increase shall become effective on August 1 of the specified year.  The second half of the increase shall become effective on February 1 of the following calendar year.  The total wage increase for each year will be as follows:

| Year | Amount | |
|------|--------|--------|
| 2013 | seventy cents | ($0.70) |
| 2014 | seventy cents | ($0.70) |
| 2015 | seventy cents | ($0.70) |
| 2016 | eighty cents | ($0.80) |
| 2017 | one dollar | ($1.00) |

(b) Newly hired part-time employees

All part-time employees, who are hired or reach seniority after August 2013 will be paid according to the following wage schedules:

|  | Hourly Rate | |
|---|---|---|
|  | Preloader Sorter | All Others |
| Start | $11.00 | $10.00 |
| Seniority plus one (1) year | $11.50 | $10.50 |
| Seniority plus one (2) years | $12.00 | $11.00 |
| Seniority plus one (3) years | $13.00 | $12.00 |
| Seniority plus one (4) years | $13.50 | $12.50 |

Employees working high volume direct or low volume direct shall receive the preloader/sorter rates.


c) the wage rates and increases provided in (a) and (b) shall be a minimum.


## Article 41.  Full-Time Employees

### Section 2.  Full-time Wage Progression

+++
(c)  The progression for employees entering a package car driving, feeder, or other full-time job (other than an air driver or a job covered by Section 3 below) after August 1, 2013 shall be as follows:

| | |
|---|---|
| Start | $18.75 |
| Seniority | $18.75 |
| Twelve (12) months | $19.50 |
| Twenty-four (24) months | $21.00 |
| Thirty-six (36) months | $25.00 |
| Forty-eight (48) months | Top Rate |

## **FACTS**

UPS operates package sorting facilities in the Philadelphia area – one near the Philadelphia International Airport (PHL) and one on Oregon Ave. Teamsters Local 623 represents the hourly package-operation employees.  The CBA between the parties consists of the National Master Agreement (NMA) and the Local 623 Supplemental Agreement. At the time these grievances were filed the current contract was for the term August 1, 2013 through July 31, 2018. (JX1)

The instant grievances relate to financial incentives unilaterally given by the Company to new and temporary employees, referred to as Market Rate Adjustments (MRAs.)  The instant grievances, filed by Teamsters Local 623, protest three separate MRA's put in place in 2017-2018:

1)  an MRA was implemented for the Chesapeake District to increase the hourly wage rate for newly hired temporary seasonal feeder drivers, so as to pay them a starting rate of $30.00, as opposed to the contract rate of $18.75 under Article 41, Section 2(c).  Local 623 jurisdiction is part of the Chesapeake District.  These feeder drivers were hired for Peak period 2017. (CX 5)

2)  a weekly retention bonus of $100 was implemented for newly hired package handlers at the PHL Air Hub and Ramp, on the Day, Twilight and Midnight shifts, for Peak period.  Package and ground handlers hired on or after September 1, 2017 were eligible to receive a bonus

from September 1, 2017 to December 24, 2017, so long as they had

perfect attendance. (CXs 6 and 7).  This retention bonus was not

offered to employees who work out of the Oregon facility.

3)  an MRA was implemented for PHL Air Hub for the period January 1,

2018 through the end of 2018 to deal with recruitment needs for the

planned expansion of airport facilities.  The MRA was a weekly

retention bonus for new hires of $100, paid so long as the employee

had perfect attendance or was available to work daily.  This retention

bonus was only given to new part-time employees who were receiving

the $10.35 per hour contract rate, and they could only receive the

bonus up until they had one year of service as a part-time employee. It

was not continued in 2019. (CXs 8, 9)  This retention bonus was not

offered to employees who work out of the Oregon facility.


Peak season is generally from November 1 to December 31, a period

when the Company has the need to hire a significant amount of additional

workers to deal with the added market demand of the holiday season.  Generally,

employees hired for Peak do not accrue seniority for that time, they do not

receive benefits, and they typically do not work beyond that period, but may be

rehired by UPS for the next year.  Testimony at arbitration from both parties

established that the needs of Peak season extend into January given the current

online shopping habits and other market forces, and Peak season employees

often are hired prior to November 1 so that they may be trained in advance.

Regular part-time hires are not eligible for many benefits or progression seniority until after they work for one year. (JX 1, pp. 70, 93, 205)

Bill Shanahan, Local 623 Trustee and Recording Secretary, and principal officer, testified for the Union.  He testified that he informed management that he did not agree with the MRAs, in that some employees who performed the same work did not get the increases and bonuses.  Mr. Shanahan testified that it was unfair to limit the retention bonuses to the PHL Air Hub, as Management failed to give a good reason for excluding workers in the Oregon facility.  Mr. Shanahan testified that the Company was not limiting the MRAs to the peak season, and it was expanding the peak season in violation of contract.

Larry Moulder, Human Resources Manager for the Philadelphia area, and Chris Langan, former VP of Finance for UPS, who has been involved for the last 15 years in contract negotiations for the Company, testified that the MRAs in issue were implemented based upon legitimate business needs, as they have done in the past in the Chesapeake District, and in different parts of the country, going back to at least 2014.  A review of the Company's documents shows that they have instituted both MRA pay rate adjustments and retention bonuses, for Peak season and for other periods of the year. (CX 4)

Mr. Moulder cited the difficulty in recruiting and retention of hires because of the competition from other similar businesses such as FedEx, motivating him

8

to request the MRAs in the Philadelphia area.  A market analysis is done to

support the MRA request.  The seasonal feeder driver MRA was applied to the

entire Chesapeake District, and Local 623 represents a small portion of that total

area, allowing the Company to hire temporary CDL-qualified drivers.  The $100

retention bonus for Peak new hires at the PHL Air Hub was requested because

of the difficulty in attracting enough applicants, but also to enhance the chances

of their retention during the critical period, given the previous high turnover rates.

Mr. Moulder testified that the location of the PHL Air Hub facility made it

particularly difficult to attract workers, given the relative inaccessibility by public

transportation.  Mr. Moulder did not seek an MRA for the Oregon facility for the

same period, testifying that they did not have the same difficulty in recruiting and

retaining new hires at that hub, apparently given its access to mass transit.

Mr. Moulder testified that in 2018 they decided to keep and expand the

retention bonus for new part-time hires at the PHL Air Hub who had less than

one year of service due to the planned expansion of the airport facilities, the

need for additional hires, and difficulties with retention of trained employees.

UPS hired 2800 employees for the PHL Air Hub in 2018, which included workers

hired for Peak.

In 2018, the parties were in negotiations for a new NMA.  The retention

bonus was discontinued once the parties reached agreement on a new CBA.

During those NMA negotiations, in January 2018, the Union proposed the

following new language to the CBA:

> In the event that the Employer is required by law or operational necessity
> to pay any employee (regular, seasonal, casual) a higher rate than the
> rate specified in the Agreement for any classification, benefits, lump sum
> bonus of any kind, or any monetary benefit, it shall first obtain the approval
> of the Union.  Unless required by law, the Employer shall not implement a
> higher rate unless it applies that rate on a uniform basis to all employees
> within the affected classification.  (CX 1)

That language was not mutually agreed upon by the parties, and was

withdrawn.  The following language was added to Article 22, the part-time wages

section in the new NMA effective August 1, 2018 through July 31, 2023:

> Section 5 (e)  Seniority part-time employees who are receiving an hourly
> rate higher than that set forth above in Section (b), as a result of a Market
> Rate Adjustment, shall not have their hourly rate reduced due to the
> implementation of this Article.

## DISCUSSION

The positions of the parties will be briefly summarized.  The Union

contends that the Company has violated the Agreement by unilaterally imposing

wage rate changes, increases and incentives which undermine the wage

progression structure laid out in the Agreement.  According to the Union, the

Company has arbitrarily discriminated against employees in the same job

classifications who did not receive the MRAs.  The Union argues that the

Company has undermined the bargaining unit by effectively creating a tiered and

geographically fractured wage system.  The Union maintains that instead of the

Local's members standing united under the same terms and conditions, the Company's actions has led to the workforce becoming artificially divided based on an arbitrary hiring date and location, with junior employees jumping over more senior employees. According to the Union, the MRAs contradict the recognition in the Contract that seniority is the objective method of awarding pay increases. The Union opines that the Company can meet its business needs by applying MRAs temporarily during the Peak Season if all workers in the same wage rate category receive the adjusted pay rate.  The Union maintains that the Company's actions violate Article 6, Section 1, the prohibition against extra-contract agreements, and the wage sections of the NMA and supplement.  According to the Union, the Company undermined the unit by not offering pay increases to Oregon Avenue employees, without justification.  The Union contends that the Company's unilateral implementation of an MRA, intended to attract and retain employees during the Peak season, was inappropriately given to employees working for 10 months after Peak season.  The Union points out that the Company excluded employees from the retention bonus who were hired outside the designated time frame, in an arbitrary and discriminatory fashion.  The Union argues that the Company may pay above the "minimum" in line with Article 5(c), but must extend the above-minimum wages to all unit employees in the same classification.  The Union opines that the previous arbitration decisions, cited by the Company involving other Teamsters locals do not bind Local 623 and are distinct from the facts in this arbitration.  According to the Union, the parties have not established a past practice of permitting unilateral and selective wage

increases outside Peak season.  The Union urges that the grievances be upheld,
and seeks an appropriate remedy for the Contract breach.

To the contrary, the Company argues that the Union has failed to shoulder
its burden of proof of proving a violation of the Agreement.  According to the
Company, prior arbitral authority is binding upon Local 623 and compels the
denial of the grievances.  The Company argues that its actions are justified by
the clear and unambiguous language of Articles 17 and 22, Section 5(c), and in
line with precedent, leading to the conclusion that there was no violation of Article
6.1.  The Company maintains that the parties' 2018 NMA negotiations support
UPS' interpretation of Articles 17 and 22.  The Company disputes the Union's
claim that the prior arbitration precedent was limited to Peak hires, and the
Union's claim that the failure to include Oregon Avenue employees in the MRAs
was arbitrary or discriminatory.  The Company urges that the grievances be
denied.

On the basis of the record evidence and the arguments of the parties, I
conclude that the grievances should be denied.

The Union bears the burden of demonstrating that the Company's
unilateral imposition of three non-negotiated MRA's during the 2017-2018 time
frame violated the parties' NMA.  On the basis of the contract language, binding
prior precedent, past practice, and bargaining history, the Union's claims must

fail.  The Union's contention that the MRA's were implemented in an arbitrary or discriminatory manner lacks merit.

The Company's decision to implement the MRA's, consisting of: 1) higher hourly rates for Peak feeder drivers;  and 2) retention bonuses limited in duration to Peak employees and to part-time employees short of one-year tenure, were reasonably implemented, after study, based upon market needs.  The Company has previously implemented similar MRA's in the Chesapeake District and in other parts of the country, since at least 2014.  The rationale for the higher pay rate for Peak CDL-qualified drivers is based upon the recruitment needs in the face of competition of similar employers, coupled with the fact that Peak drivers do not receive benefits or the promise of continued employment.  Similarly, the retention bonus, based on attendance, for part-time Peak employees at the PHL Air Hub, was implemented to address the problem of retaining trained new hires for the entire Peak season.  Finally, the 2018 retention bonus was driven by the need to retain part-time employees, less than one-year in duration, due to the need for personnel in connection with the planned expansion of PHL airport activities.  The retention bonuses were given to employees who lacked benefits and the right to accrue progression seniority because they were either hired only for Peak, or were part-time employees with less than one-year tenure, whose rights to those benefits did not ripen prior to a year.  The bonuses were put in place to enhance recruitment and retention.

The contract language relied upon by the Company, in justifying the MRAs, is Article 17, which reflects that "rates of pay provided for by this Agreement shall be minimums," as well as the language of Article 22, Section 5(c), which indicates that the wage rates and increases for part-time employees set forth in Sections 5(a) and (b) "shall be a minimum."

The Union argues that the MRAs are an "extra contract agreement" as described in Article 6, which expressly prohibits the Company from entering into any individual or collective agreement with employees that conflicts with the provisions of the Agreement. The Union makes equity arguments related to the preservation of the integrity of the bargaining unit and contract. The Union argues that the Company's actions have undermined the unit by effectively favoring one employee against another, holding the same jobs. In a nutshell, the Union seeks an interpretation of the "minimum" language in the wage paragraphs to mean that any increases are paid across the board to similar employees.

However, these very arguments, and others made by Local 623 in this forum, have been the addressed and resolved in arbitration awards cited by the Company. At bottom, this precedent concludes that similar MRAs, as have been put in place here, do not run afoul of the parties' Agreement.

The Union contends that the cited cases are not binding upon Local 623 as there is not an identity of parties and issues. This argument is misplaced.

14

Article 2, Section 1 of the NMA clearly states that "all employees covered by this Master Agreement and the various Supplements, Riders and Addenda thereto, shall constitute one (1) bargaining unit."  Also, as was pointed out by Arbitrator Glendon in *UPS and Teamsters Local 413,* AAA Case No. 01-16-0005-4593 (2017) arbitration of grievances that "raise an issue of interpretation of a Master Agreement Article or Section," as defined in Article 8, Section 6, is described as "binding" in both Sections 4 and 7 of Article 8.  Arbitrator Glendon went on to opine:

> Thus it is clear that the parties bargained for finality of such arbitration decisions not only as to a particular grievance being arbitrated, but also to the "*issue of interpretation* of a Master Agreement Article or Section" presented therein, and an arbitrator's decision in such a case resolves both that specific dispute about the meaning and application of an NMA Article or Section *and* the broader "issue of interpretation" of that provision, and in effect becomes part of the NMA for the remainder of its term.  As such, it must be respected and applied by arbitrators in subsequent cases presenting the same issue.  To do otherwise would deprive the parties of the benefit of their bargain; encourage abuse of the grievance and arbitration procedure and confusion and irreconcilable conflict in application of contract provisions interpreted differently by different arbitrators…"  (Id. at 9-10. Emphasis in original).

Therefore, the arbitration awards cited by the Company in this arbitration are binding upon the parties to the instant grievances.  The awards were reasonably decided, I conclude they are relevant to the issues and factual circumstances before me, and I shall rely upon them.

In the arbitration awards cited by the Company, the arbitrators interpreted the same contract language that is at issue here, under similar facts patterns and Union challenges, and concluded that the Company did not violate the

15

Agreement when it unilaterally implemented MRAs. *Teamsters Local 413 and UPS*, supra.; *Teamsters Local 162 and UPS*, AAA Case No 01-16-0002-7387 (Axon, arb.; 2017); *Teamsters Local 344 and UPS*, AAA Case No. 01-17-0003-7264 (Briggs, arb.; 2017); *Teamsters Local 243 and UPS*, AAA Case No. 01-17-0003-7268 (Glendon, arb.; 2018). Arbitrator Axon in the Local 162 case dealt with the imposition of retention bonuses for part-time employees hired for Peak. Arbitrator Axon concluded that Article 22, Section 5(c) represented a retention of managerial discretion to offer wage rates and increases so long as the right was exercised in a non-arbitrary, non-discriminatory manner, with no evidence of bad faith. Arbitrator Axon determined that the Company's action was solely motivated by market conditions and business needs. He found that the Company, like here, could award such bonuses to only a portion of the part-time employees based on seasonal needs, and such Company action was not discriminatory or arbitrary. The arbitrator concluded that bonuses are "increases" within the meaning of Article 22, Section 5(c) and do not violate Article 6, Section 1. In other words, the Company's unilateral imposition of the MRA was not an Extra Contract Agreement outlawed by Article 6, Section 1 because it "conflicts with the provisions of this Agreement," since it was an appropriate exercise of the managerial rights retained under the Agreement in Article 22, Section 5.

Arbitrator Glendon in the Local 413 matter relied upon the Axon award, concluding that similar retention bonuses for part-time non-seniority employees did not run afoul of the Agreement. This award speaks to the Union's argument

here that offering MRAs outside Peak violates the Agreement.  To the contrary, in that case, bonuses which extended beyond Peak were upheld where they were motivated by market forces and sound business decisions.

The issue of paying feeder drivers higher wages during Peak was addressed in the remaining awards, involving Teamsters Locals 344 and 243, both of which concluded that UPS had the right to offer higher rates for such CDL-qualified employees during Peak to the seasonal drivers without offering the same increase to other drivers. The Company laid out its rationale in those cases in a similar fashion as it did in this matter.  As Arbitrator Glendon opined in the Local 243 decision, the higher pay was "motivated by sound, non-arbitrary and non-discriminatory business reasons."

In line with the above binding precedent, I find that the MRAs at issue in the instant grievances are not Extra Contract Agreements as defined in Article 6, Section 1, but are a reasonable and non-arbitrary exercise of discretion retained by UPS in Article 22, Section 5.  Buttressing this ruling is the evidence of past practice in this case, showing that the Company has been implementing similar MRAs for years, including in Local 623's District.  As to the Union's argument regarding the failure of the Company to grant the MRAs to Oregon Ave employees, I was persuaded that the Company had non-discriminatory and non-arbitrary reasons to limit the MRAs to the PHL Hub in this particular case, given

17

the expansion of airport demands at the time, and the relative lack of mass transit making recruitment more difficult at the airport facility.

As stated above, the parties did not mutually agree to expand my consideration of contract sections beyond those referenced in the Submission to the NGC.  However, even if the Local 623 Supplemental contract language cited by the Union is considered, I find nothing there that would require a different result.

Finally, there is strong bargaining history evidence supporting the Company's position in this case.  The parties were in negotiations for a new NMA in 2018, and did not conclude those negotiations until after the arbitration awards cited above had issued.  Therefore, the parties were aware of this binding precedent, and the fact that those cases guided future arbitrators as to the interpretation of the Agreement as it relates to MRAs.  To demonstrate this understanding, the Union proposed contract language that would require the very rights Local 623 is seeking in this proceeding – that any MRA higher rate or bonus could only be implemented with agreement by the Union, and granted on a uniform basis to all employees within the affected classification.  The parties failed to agree on that provision, and the proposal was withdrawn.  To further reflect the Union's understanding of the parties' current mutual rights and obligations, the parties mutually agreed to a change in Article 22, confirming that seniority employees receiving a higher rate "as a result of a Market Rate

18

Adjustment, shall not have their hourly rate reduced due to the implementation of this Article." Quite simply, this shows that Local 623 is attempting through the vehicle of the instant grievances to obtain what the Union failed to secure in collective bargaining.

For all of the above reasons, I find that the Company has not violated the Agreement, and I shall deny the grievances.

## <u>AWARD</u>

In line with the above Opinion, I conclude that the Union failed to prove a violation of the parties' collective bargaining agreement.  Accordingly, the grievance is denied.

_____
Margaret R. Brogan, Arbitrator

Date:  August 12, 2019