UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS and TEAMSTERS UPS NATIONAL NEGOTIATING COMMITTEE,  ) ) ) ) )<br><br>Plaintiffs )<br>)<br>v. )<br>)<br>UNITED PARCEL SERVICE, INC., )<br>)<br>Defendant. )<br>) | Case No. 26-cv-10666-DJC |

**MEMORANDUM AND ORDER**

**CASPER, C.J.**                                                                                         **February 20, 2026**

## I.    Introduction

Plaintiffs International Brotherhood of Teamsters ("IBT") and Teamsters UPS National Negotiating Committee (collectively, the "Union") seek injunctive relief against Defendant United Parcel Service, Inc. ("UPS"), enjoining UPS from implementing a planned voluntary separation program pending resolution of the Union's grievance regarding the program or its grievance related to an earlier, similar program.  D. 2.  After considering the motion and UPS's opposition, D. 2; D. 3; D. 14; D. 15; D. 16, and having heard oral argument of the parties, D. 17, the Court DENIES the motion.

## II.   Factual Background

The Court draws the following facts from the verified complaint and exhibits thereto and the declarations in support of UPS's opposition and exhibits thereto.  D. 1; D. 15; D. 16.

1

A. **The Collective Bargaining Agreement**

UPS has approximately 370,000 employees in the United States, roughly 80% of whom are represented by IBT. D. 15 ¶ 3. The Union and UPS are parties to the National Master UPS Agreement ("NMA"). D. 1 ¶ 6; D. 1-1. The NMA covers the terms and conditions of employment of certain UPS employees, who comprise the bargaining unit. D. 1 ¶¶ 6, 8. UPS bargaining unit employees are also covered by local supplemental agreements or riders; those working in Massachusetts are covered by the New England Supplemental Agreement. Id. ¶ 16; D. 1-2. As expressed in Article 1 of the NMA, the parties entered same "with a mutual intent of preserving and protecting work and job opportunities" for covered employees. D. 1-1 art. 1; D. 1 ¶ 10. Other provisions of the NMA concern, *inter alia*, the Union's role as bargaining unit employees' representative, see D. 1-1 art. 3, § 1(a); UPS's staffing and job creation efforts, id. § 7(a); id. art. 22, § 3; union steward presence at UPS meetings with employees regarding grievances, discipline or investigatory interviews, id. art. 4; and the Union and UPS's efforts to address competition, id. art. 26, § 2; see D. 1 ¶¶ 11-15. Additionally, Article 57, § 3 of the New England Supplemental Agreement provides procedures to be followed in the event of layoffs impacting bargaining unit employees covered by the supplement. D. 1-2 art. 57, § 3; D. 1 ¶ 17.

Article 6 of the NMA limits UPS's ability to contract with bargaining unit employees in a manner that conflicts with the NMA:

> Except as may be otherwise provided in this Agreement, [UPS] agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void.

D. 1-1 art. 6, § 1; D. 1 ¶ 9. Article 8 provides a grievance process to address alleged violations of the NMA, which can culminate in arbitration. D. 1 ¶ 7; D. 1-1 art. 8.

B.  **The Driver Choice Program**

UPS's proposed Driver Choice Program ("DCP") would enable eligible UPS employees to elect to receive a lump sum payment in exchange for resigning employment, releasing claims against UPS and agreeing not to seek future employment with UPS.  D. 1 ¶ 18.  According to UPS, the DCP was created to address a decline in package volume, including reductions in the volume UPS handles for Amazon, and changes to UPS's delivery network.  D. 15 ¶¶ 4-5.  Approximately 105,000 drivers in the United States would be eligible for the DCP.  Id. ¶ 6.  In addition to the DCP, UPS intends to reduce its driver workforce through attrition and involuntary layoffs.  Id.

UPS notified IBT that it was considering the DCP on January 8, 2026.  Id. ¶ 7.  On January 9, 2026, UPS sent draft materials to IBT regarding the program and informed IBT that UPS intended to mail DCP materials to employees beginning on February 11, 2026.  Id. ¶ 8; D. 1 ¶ 18; D. 15-1 at 2; see D. 15-6 at 2.  The draft materials included an offer letter, a separation and release form (the "Release") and a personalized separation statement.  D. 1 ¶¶ 18, 20, 24; D. 1-3; D. 1-4; D. 1-5.  UPS informed IBT that the enrollment window would run from February 13 to March 12, 2026.  D. 1 ¶ 18.  As proposed, employees must execute the Release to participate in the DCP.  Id. ¶ 20; D. 1-4.  The Release provides that it is irrevocable unless revoked in writing within seven calendar days of execution.  D. 1 ¶ 23; D. 1-4 at 5.  UPS intends to begin separations under the DCP on approximately April 26, 2026.  D. 15 ¶ 14.

The Union was not aware of the DCP until the program terms were materially final.  D. 1 ¶ 19.  Nearly three weeks after learning of the program, on January 27, 2026, IBT informed UPS that it believed the DCP violated the NMA and could not be implemented without the Union's agreement, and IBT requested additional information regarding the program.  See id. ¶ 25; D. 1-6.  The parties exchanged additional correspondence but did not resolve their dispute about the DCP.  See D. 1 ¶¶ 26-28; D. 1-7; D. 1-8; D. 1-9; D. 15 ¶¶ 9-10; D. 15-7; D. 15-8.

3

On February 6, 2026, the Union filed a grievance pursuant to Article 8 of the NMA alleging that UPS's implementation of the DCP violates Articles 1, 3, 4, 6, 22 and 26 of the NMA and the layoff/reduction-in-force procedures in local supplemental agreements. D. 1 ¶ 29; D. 1-10. UPS provided a written response to the grievance on February 12, 2026. D. 15 ¶ 12; D. 15-9 at 2. In its complaint here, the Union raises NMA allegations consistent with those in its grievance and alleges that the DCP violates Article 57, § 3 of the New England Supplemental Agreement. D. 1 ¶¶ 35-37. The Union alleges that it faces irreparable harm absent an injunction because its grievances will not be resolved until after the DCP participation window has closed and participants' Releases become irrevocable. See id. ¶¶ 40-42. UPS, on the other hand, contends that a delay in implementing the DCP may, *inter alia*, cause UPS to rely more upon attrition and involuntary layoffs and prevent eligible employees from being able to participate. D. 15 ¶ 15.

### C. The DVSP

The parties agree that the DCP is similar to a program UPS implemented in July 2025 known as the DVSP. D. 1 ¶ 30; D. 15 ¶ 13; see D. 14 at 15-16.[1] The DVSP was offered to thousands of bargaining unit drivers and provided certain severance pay to those eligible who voluntarily relinquished employment with UPS and executed separation agreements. D. 1 ¶¶ 30-31. Out of the nearly 115,000 drivers eligible for the DVSP, approximately 3,000 participated. D. 15 ¶ 13.

The Union also was not involved in creating the DVSP, and Teamster Local Unions around the country filed grievances alleging that this earlier program violated the NMA. D. 1 ¶¶ 32-33. As UPS points out, see D. 14 at 10-11, Teamsters Local 710 (which UPS does not plan to include

---

[1] The Union refers to this program as the "Driver Voluntary Severance Plan," D. 1 ¶ 30, while UPS refers to it as the "Driver Voluntary Separation Program," D. 15 ¶ 13; D. 15-7 at 2.

in the DCP, see D. 15-1 at 2) unsuccessfully sought to enjoin the DVSP pending resolution of its grievance regarding same, see Teamsters Loc. 710 v. UPS, No. 25-cv-09775 (N.D. Ill. Aug. 26, 2025), D. 26.[2]  At least one DVSP grievance will be presented to the National Grievance Committee in March 2026. D. 1 ¶ 33. If the National Grievance Committee fails to reach a majority decision, which the Union believes is likely, either party will have the right to advance the grievance to arbitration pursuant to Article 8 of the NMA. Id.

### III. Procedural History

The Union initiated this action on February 9, 2026, D. 1, and filed an emergency motion on the same day seeking a temporary restraining order and preliminary injunction, D. 2. On February 10, 2026, UPS stipulated that it would refrain from implementing the DCP to preserve the status quo until the Court resolved the Union's motion. D. 8. The next day, February 11, 2026, the Court set a deadline for UPS to respond to the motion and set a February 19, 2026, motion hearing date. D. 12. The Court heard the parties on the pending motion and took the matter under advisement. D. 17.

### IV. Legal Standard

Under the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, courts are typically prohibited from issuing injunctions "in peaceful labor disputes over arbitral issues." Tchrs. Ass'n of Japanese Educ. Inst. of N.Y., Inc. v. Japanese Educ. Inst. of N.Y., 724 F. Supp. 188, 191 (S.D.N.Y. 1989). A narrow exception to this "strong prohibition" on injunctive relief allows courts to issue injunctions "to 'enforce[] the obligation that the [recalcitrant party] freely undertook under a

---

[2] At the motion hearing, counsel for the Union highlighted the temporary restraining order initially issued in that case. See Teamsters Loc. 710, No. 25-cv-09775 (N.D. Ill. Aug. 16, 2025), D. 11. The Court has considered this decision, even as it was superseded by the August 26th Order denying the motion for preliminary injunction, but concludes that the latter order reflects a fuller record and the Court finds its reasoning more persuasive.

5

specifically enforceable agreement to submit disputes to arbitration.'" Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988) (alterations in original) (quoting Boys Mkts., Inc. v. Retail Clerks Union, Loc. 770, 398 U.S. 235, 252-53 (1970)); see N.Y. State Nurses Ass'n v. Montefiore Med. Ctr., 457 F. Supp. 3d 430, 432 (S.D.N.Y. 2020) (collecting cases regarding the "narrow" scope of this exception). To obtain such a Boys Markets injunction,[3] a movant must show (1) that the grievance is arbitrable, (2) that an injunction is needed to preserve the arbitration and (3) irreparable harm (i.e., that arbitration would become meaningless absent injunctive relief) and imbalanced hardships. IBT, Loc. Union No. 251 v. Almac's, Inc., 894 F.2d 464, 465 (1st Cir. 1990).[4] The purpose of this type of injunctive relief "is not to remedy a breach of [a] collective-bargaining agreement, but rather to hold the parties to their agreement to arbitrate." Nat'l Ass'n of Letter Carriers v. U.S. Postal Serv., 419 F. Supp. 3d 127, 133 (D.D.C. 2019) (emphasis in original).

A preliminary injunction in this context must also meet the traditional requirements for injunctive relief. Verizon New England, 651 F.3d at 184. Accordingly, in deciding whether to

---

[3] A traditional Boys Markets injunction is sought against a union. See Procter & Gamble, 864 F.2d at 929 n.2. An injunction sought against an employer, as here, is known as a "reverse Boys Markets injunction." Id.

[4] The First Circuit has sometimes articulated the standard for a Boys Markets injunction slightly differently, requiring (1) a collective bargaining agreement with a mandatory arbitration provision, (2) a dispute giving rise to the action sought to be enjoined that is subject to the provision and (3) that principles of equity warrant the injunction. Otis Elevator Co. v. Int'l Union of Elevator Constructors, Loc. 4, 408 F.3d 1, 7 (1st Cir. 2005) (citing Nat'l Elevator Indus., Inc. v. Int'l Union of Elevator Constructors, 776 F.2d 374, 376-77 (1st Cir. 1985) (same)). In Verizon New England, Inc. v. IBEW, Loc. No. 2322, 651 F.3d 176 (1st Cir. 2011), the court stated that "[s]ome courts have recognized" reverse Boys Markets injunctions and suggested these are permitted where (1) the underlying dispute is subject to mandatory arbitration and (2) an injunction is needed to prevent arbitration from being rendered a hollow formality. Id. at 184 n.4. The court also appeared to question whether the framework of Boys Markets applies to alleged violations of collective bargaining agreement provisions other than no-strike clauses. Id. at 186-87 & 187 n.7. Here, the Court applies the standard as articulated by the parties, D. 3 at 10-11; D. 14 at 11, and does not understand these formulations to differ meaningfully.

issue a preliminary injunction in this context, the Court also must assess "(1) the [movant]'s likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the [nonmovant] less than denying an injunction would burden the [movant]; and (4) the effect, if any, on the public interest." González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)). "In the Boys Markets environment, arbitrability replaces the fourth factor entirely, and tends to preempt the first." Procter & Gamble, 864 F.2d at 930 n.3.

## V. Discussion

Because UPS concedes that the grievance is arbitrable, see D. 14 at 11, 14 n.2, the Court concludes that the first prong for a Boys Markets injunction is met. See Almac's, 894 F.2d at 465. As to the remaining Boys Markets factors, the Union collapses its arguments, contending that without an injunction, UPS will implement the DCP "and a significant number of [bargaining unit] employees will execute irrevocable releases," their "seniority rights will be extinguished," any compensation they receive "will, in all likelihood, be spent . . . or otherwise incapable of being recaptured" and they will lose future pension accruals and health coverage. D. 3 at 12-15. As argued by the Union, "an arbitrator appointed under the NMA has no authority to nullify an executed Release" because the arbitrator is limited to "apply[ing] the provisions of [the] Agreement." Id. at 14 (alterations in original); see id. at 15 (arguing that an "arbitrator cannot undo the legal consequences of resignation or compel the recreation of seniority rights, pension accruals and health benefit eligibility").

Here, the Union has failed to demonstrate that this is one of the rare cases warranting issuance of a labor injunction. See Procter & Gamble, 864 F.2d at 932. First, the Union has not shown that an injunction is needed to preserve the arbitration. The Union's argument that

arbitration will be rendered a "hollow formality" absent an injunction, see D. 3 at 14, hinges on its contention that an arbitrator could not "nullify an executed Release," see id. As UPS points out, however, see D. 14 at 14-15, such an interpretation of the NMA is flawed. In relevant part, Article 6 provides that any contract UPS enters into with a covered employee that "in any way conflicts with" the NMA "shall be null and void." D. 1-1 art. 6, § 1.[5] The Union itself alleges that the Release is a contract that conflicts with the NMA, within the meaning of Article 6. D. 1 ¶ 36. The grievance procedure in the NMA authorizes an arbitrator to "apply the provisions of [the NMA] and to render a decision on any grievance" but does not authorize an arbitrator "to amend or modify [the NMA] or to establish new terms or conditions of employment." D. 1-1 art. 8, § 6. If the Union's grievance alleging that the DCP (and Release) conflicts with the NMA is sustained, the NMA operates to invalidate such agreements. Id. art. 6, § 1. While other provisions of the NMA more specifically authorize other arbitration remedies, such as back wages, see id. art. 37, § 1(c), the Court is not persuaded that an arbitrator would be powerless to determine that a Release executed by a bargaining unit employee was invalid. See Procter & Gamble, 864 F.2d at 931 (noting that arbitral relief "would be far from meaningless" where it "remained altogether conceivable . . . that an arbitrator could restore the work schedules and dress requirements that existed beforehand"); Teamsters Loc. 710, No. 25-cv-09775 (N.D. Ill. Aug. 26, 2025), D. 26 (concluding when faced with similar language that "the arbitrator will have the power and authority to void any and all buyout agreements that are signed by Union members, in the event [Teamsters Local 710] succeeds on the merits at arbitration"); Loc. Union 15, IBEW v. Exelon Corp., 191 F. Supp. 2d 987, 993-95 (N.D. Ill. 2001) (concluding union had not shown arbitrator was incapable

---

[5] The New England Supplemental Agreement contains a similar provision. D. 1-2 art. 47, § 2.

of remedying alleged harms resulting from layoffs).

Second, the Union has failed to show that it will suffer irreparable harm in the absence of an injunction (i.e., that any arbitration would be rendered meaningless in the absence of the requested injunctive relief). See Almac's, 894 F.2d at 465 & n.2. As the Union recognizes, the concepts of irreparable harm and preservation of arbitration are related. See D. 3 at 12; Almac's, 894 F.2d at 465 (analyzing "whether, without the injunction, arbitration would be meaningless and irreparable harm [would] result"). Some courts have recognized irreversible loss of employment as an irreparable harm in this context. See, e.g., SEIU Healthcare 1199NW v. Cmty. Psychiatric Clinic, No. 19-cv-1210-MJP, 2019 WL 3779872, at *4-5 (W.D. Wash. Aug. 12, 2019) (concluding that union established irreparable harm that could not be undone by arbitrator, including permanent loss of employment and healthcare coverage, but denying motion for injunctive relief); IBEW, Loc. 2327 v. Consol. Commc'ns of N. New England Co., No. 19-cv-265-NT, 2019 WL 7546601, at *2 (D. Me. Aug. 23, 2019) (concluding that restoring "union employees to their positions would not be as simple as flipping a switch" because after sale subject to injunction, third-party buyer would control business unit); IBT, Loc. Union No. 639 v. Airgas, Inc., 239 F. Supp. 3d 906, 914-15 (D. Md. 2017) (concluding irreparable harm was established where undoing operations transfer that would eliminate union positions would require employer "to reconfigure its physical facility in a way that undoes an activity necessary to comply with federal regulations and requirements" and employer had begun to replace union roles with non-union equivalents); but see City, Cnty. & Waste Paper Drivers Loc. Union No. 244 v. Republic Servs., Inc., No. 10-cv-2928, 2011 WL 332731, at *1-2 (N.D. Ohio Jan. 31, 2011) (concluding fear of layoffs was not irreparable harm and that actual employment loss would not be either). As the Court has already concluded, however, the Union has not shown such harm here, where an arbitrator is capable of remedying

same. See Almac's, 894 F.2d at 466-67 (concluding union had not shown irreparable injury where case did not present a "Humpty Dumpty situation" in light of employer's agreement not to consummate business sale and arbitrator's authority to order reinstatement and backpay); Procter & Gamble, 864 F.2d at 932 (upholding denial of injunction where potential harms would not rise to "irretrievable loss of workers' primary employment").

At the motion hearing, counsel for the Union highlighted UPS's representation in correspondence that it has not established any "aggregate or location-specific caps on program participation." See D. 15-7 at 3. The Union's counsel, accordingly, predicted that a significant number of bargaining unit employees will ultimately leave UPS employment because of the DCP, more than the approximately 3,000 employees who participated in the DVSP. See D. 15-8 at 2. Setting aside the speculative nature of this argument, it does not impact an arbitrator's authority to remedy the harms alleged, even as the Court recognizes that it could make any remedy more difficult to implement. See Exelon, 191 F. Supp. 2d at 995 (noting that although particular remedy "would be complex and difficult, there [was] nothing to indicate that the arbitrator would not have the authority or the ability to see it through"); Procter & Gamble, 864 F.2d at 932-33 (noting that disruptiveness of interim harms did not compel conclusion that such were irreparable).

Third, the balancing of the harms does not weigh in favor of granting the injunctive relief that the Union seeks. See Procter & Gamble, 864 F.2d at 930. The harms upon which the Union relies will not occur unless and until a bargaining unit employee voluntarily participates in, and is separated through, the DCP.[6] Moreover, the Court notes that UPS also intends to reduce its driver workforce in 2026 "through attrition and involuntary layoffs," see D. 15 ¶ 6, and the DCP is a

---

[6] The Court notes that the Union does not develop any argument regarding harm to the Union separate from the alleged harm to its members. See D. 3 at 12-15.

measure through which it intends to "reduce the need for involuntary layoffs," id., a reduction-in-force process that the Union concedes UPS has the authority to elect, see D. 3 at 5. This, in the Court's view, differentiates this case from those situations where a union sought to enjoin an employer action that would inevitably result in involuntary employment loss. See, e.g., Salesdrivers, Helpers & Dairy Emps., Loc. Union No. 683 v. Pasha Auto. Servs., No. 21-cv-1888 JLS (DEB), 2022 WL 485015, at *4 (S.D. Cal. Feb. 16, 2022) (noting that cases in which a reverse Boys Markets injunction have issued "typically involve[d] an employer relocating or closing an employment site or revoking healthcare benefits for a number of employees"). Coupled with the Court's conclusion that an arbitrator's determination that the DCP conflicts with the NMA would render same "null and void," see D. 1-1 art. 6, § 1, and UPS's concession to that effect, see D. 14 at 15, the Court is persuaded that the Union has not shown the balance of harms tips in its favor. Cf. IBEW, 2019 WL 7546601, at *3 (concluding equities favored union where risks of irreversible job loss and loss of bargaining unit absent injunction outweighed employer's potential interim losses). In sum, the Union has not demonstrated that the requirements for an injunction under Boys Markets are met.

Although the Union's motion fails for the reasons described above, see Int'l Ass'n of Machinists & Aerospace Workers v. E. Air Lines, Inc., 826 F.2d 1141, 1147 (1st Cir. 1987) (explaining that "[i]n the case of a labor dispute a court of the United States has no traditional preliminary injunctive power" (emphasis in original)), the Union also has not made the required showing that the traditional elements of injunctive relief are met, see Verizon New England, 651 F.3d at 184, 186. The Union must demonstrate that the likelihood of success on the merits, irreparable harm, balance of hardships and public interest support issuance of an injunction. See González-Droz, 573 F.3d at 79. In this context, "arbitrability replaces the fourth factor entirely,

11

and tends to preempt the first." Procter & Gamble, 864 F.2d at 930 n.3. So as not to usurp the role of the arbitrator, courts evaluating likelihood of success on the merits have looked to whether the movant has established that its position is "sufficiently sound to prevent the arbitration from being a futile endeavor." NAGE, Inc. v. Nat'l Emergency Med. Servs. Ass'n, 969 F. Supp. 2d 59, 71 (D. Mass. 2013) (quoting Loc. Lodge No. 1266, Int'l Ass'n of Machinists v. Panoramic Corp., 668 F.2d 276, 284-85 (7th Cir. 1981)); see IBEW, 2019 WL 7546601, at *2 (describing this requirement as a "low bar"). Even assuming *arguendo* that the Union's position is "sufficiently sound,"[7] the Union relies upon the same irreparable injury argument that the Court already found lacking, see D. 3 at 16 (incorporating argument regarding "the irrevocable nature of the Release"), and the Court need go no further, see Verizon New England, 651 F.3d at 179, 186-87 (noting that "[t]here [was] no reason why the district court could not jump, as it did, to the irreparable injury issue" and agreeing that Boys Markets motion failed for lack of irreparable injury). Moreover, the Court has already concluded that the balance of hardships does not favor issuance of an injunction. In light of the Court's analysis regarding these factors, it further concludes that the public interest favoring arbitration of labor disputes, see Procter & Gamble, 864 F.2d at 930 n.3, is best served here if the Court declines to grant the relief sought.

## VI.  Conclusion

For the foregoing reasons, the Court DENIES the Union's motion for injunctive relief. D. 2.

**So Ordered.**

                                                                       /s Denise J. Casper
                                                                       Chief United States District Judge

---

[7] Although UPS argues that the Union fails to satisfy this factor, see D. 14 at 19-21, it separately concedes that the Union's grievance is "colorable . . . though one that UPS believes will ultimately fail," see id. at 14 n.2.